Filed 9/27/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL VALADEZ et al.,<br><br>    Defendants and Appellants. | B239983<br><br>(Los Angeles County<br>Super. Ct. No. BA 368836) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William N. Sterling, Judge.  Affirmed with modifications.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Valadez.

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant for Frank Uribe.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell, Thomas C. Hsieh and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 1 and 3 through 8 of the Discussion.

Appellants Frank Uribe and Daniel Valadez challenge their convictions for conspiring to commit the crimes of shooting from a vehicle and assault with a semiautomatic firearm and for possession of a firearm by a felon, along with gang and other enhancements. They raise a host of alleged errors, both together and individually.[1] In the published portion of this opinion, we reject their evidentiary and confrontation clause challenges to the prosecution's gang expert witness. In the unpublished portion, we find no prejudicial error on any other ground. We affirm. We modify the judgment to reflect additional presentence credits as provided herein.

## PROCEDURAL HISTORY

Appellants were charged with conspiracy to commit the crimes of shooting from a vehicle and assault with a semiautomatic firearm (Pen. Code, §§ 182, subd. (a)(1), 245, subd. (b), 12034, subd. (c) [repealed eff. Jan. 1, 2012, and reenacted as § 26100 without substantive change]),[2] and being felons in possession of a firearm (§ 12021, subd. (a)(1) [repealed eff. Jan. 1, 2012, and reenacted as § 29800, subd. (a)(1) without substantive change]).[3] It was alleged that the acts were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(B)). It was also alleged as part of count 1 that Valadez was armed with a firearm (§ 12022, subd. (a)(1)), and as part of counts 1 and 2 that he had incurred a prior serious or violent felony

---

[1]    They have also indicated they join each other's arguments.

[2]    Undesignated statutory citations are to the Penal Code.

[3]    In support of the conspiracy count, the following overt acts were alleged: "On or about March 6, 2010 at approximately 1:50 A.M., Frank Uribe, Daniel Valdez [*sic*], and/or one or more unidentified co-conspirators entered rival gang territory claimed by the Locke Street criminal street gang"; "At the time they entered Locke Street gang territory, Frank Uribe, Daniel Valdez [*sic*], and/or one or more unidentified co-conspirators were wearing bandanas covering the lower portion of their faces"; "On or about March 6, 2010 at approximately 1:50 A.M., Frank Uribe, Daniel Valdez [*sic*], and/or one or more unidentified co-conspirators was armed with a Glock semiautomatic firearm, serial # ATG469." A fourth overt act was stricken.

"strike" conviction (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and a prior serious felony conviction (§ 667, subd. (a)(1)).

Appellants stipulated to their prior felony convictions and following trial, a jury convicted appellants as charged and found the firearm and gang allegations true. Valadez was sentenced to a state prison term of 23 years on count 1 and his sentence on count 2 was stayed, and Uribe was sentenced to a state prison term of 14 years on count 1 and his sentence on count 3 was stayed. In addition to imposing various fines and fees, the court granted each appellant 852 days of presentence custody credit, which consisted of 742 actual days and 110 days of conduct credit. Both appellants timely appealed.

## STATEMENT OF FACTS

### 1. *Prosecution Evidence*

Around 1:50 a.m. on March 6, 2010, Los Angeles Police Department (LAPD) Officers Richard Wilson and Peter Bueno were heading east on Ithaca Avenue in El Sereno while on patrol. They each saw a white vehicle on Ithaca Avenue with its lights off, driving "extremely slow," about five miles per hour in their direction. There were no other people or traffic in sight. The officers each shined a spotlight on the car and saw Uribe in the driver's seat and Valadez in the front passenger seat wearing green bandanas covering the lower portion of their faces, which they pulled down as the officers drove by.

The car accelerated as it passed the officers and Wilson drove in reverse down Ithaca Avenue to follow it. It turned down Belleglade Avenue, and Wilson completed a three-point turn and pursued it. It came to a rolling stop at Alhambra and Belleglade Avenues, at which point the officers saw Valadez, the front passenger, throw a black or blue steel handgun out the passenger window. After that, the officers saw furtive movements in the car. The car turned onto Alhambra Avenue, where the officers conducted a traffic stop near Valley Boulevard and requested a backup unit.

3

After additional officers arrived and took appellants into custody, Officer Lowe[4] drove Officer Bueno back to Alhambra and Belleglade Avenues, where Officer Lowe recovered a black semiautomatic pistol from where Officer Bueno had seen the gun tossed from the car. It was fully loaded with 16 rounds; it was not registered to either appellant and no usable fingerprints were recovered from it. After a search, three bandanas were recovered from the car: a green bandana from under the driver's seat; and one green and one blue bandana from under the front passenger seat.

Officers ran the car's license plate and learned it had possibly been carjacked in West Covina, although Officer Wilson did not intend to arrest appellants only for carjacking. West Covina officers briefly took custody of appellants, but no carjacking or car theft charges were filed.

In the transcript of the radio transmission between Officer Bueno and dispatch, there was no mention at any time of a gun being tossed from appellants' car. Officer Bueno testified it would have been important information to broadcast when reasonable and safe to do so, but at the time he did not share that information because he wanted to keep eyes on appellants, who were making furtive movements and possibly reaching for another weapon. The reports prepared by Officers Bueno and Wilson also did not state appellants were driving slowly with headlights off. Neither officer recalled Officer Lowe being on the radio that night or calling him on his cell phone before he arrived on the scene.

The prosecution called Officer Allan Krish as a gang expert witness, who testified appellants were members of a gang called "Lowell Street," which split from a larger gang called "El Sereno" in the 1980's. Krish had been an officer for six and a half years and had been assigned to a gang enforcement division from March 2009 to January 2011. Part of that position was to keep up to date on gang activities in the Hollenbeck division by gathering intelligence on gangs in the area; identifying and photographing gang members; tracking gang members and their activities; working with parole and probation

---

[4] Apparently Officer Lowe's first name does not appear in the trial record.

4

officers and gang detectives; conducting probation, parole, and compliance searches on gang members; and investigating gang-related crimes. Officer Krish had approximately 40 hours of training at the Los Angeles Police Academy on gang awareness, including gang terminology, culture, dress, and behavior. He also attended a four-day training held by the California Gang Investigators' Association in late 2009. And he had contact with gang members on a daily basis, which could be "nothing more than [a] casual conversation," during which he would ask them if they'd be willing to talk and if they agreed, he would speak with them. He explained the importance of these interactions: "As a gang officer, when you are assigned to monitor a specific gang or area, you get a lot of information by just talking to gang members if they're willing to talk to you and get to know who belongs in that area, who doesn't belong in their area, what's going on with the gang." He also spoke with gang members while on patrol and in arrest-like situations. He spoke with other officers, gang experts, and gang detectives, and read online articles.

Officer Krish explained several ways in which someone would enter a gang: by being "jumped in" or beaten; by being "courted in" or having a family member already part of the gang; or by completing a "mission," which could be anything from graffiti to murder. Once part of the gang, a member must still prove loyalty to the gang by "putting in work," or by doing things to benefit, promote, and earn respect for the gang and to establish fear in the community.

Officer Krish had testified numerous times as a gang expert witness on gangs in the Hollenbeck area, including El Sereno, Lowell Street, and Rose Hills gangs. With regard to El Sereno and Lowell Street, Officer Krish learned the history and inner workings of the gangs from gang experts and gang detectives, some with 30 years of experience on the job, by reading "verbiage and literature" from department resources, and by talking with gang members to confirm the information he knew. He explained El Sereno was started in the 1960's, taking the name from the El Sereno community it claimed, and its purpose was to protect the area from outside gangs. At the time of trial, it had 360 to 400 predominantly Hispanic members. El Sereno also had "cliques" based

5

on neighborhoods, including the Ithaca Avenue clique and the Guardia Street clique with territory in the area around Ithaca and Belleglade Avenues.

Lowell Street was started after an internal conflict within the El Sereno gang in the mid- to late-1980's over narcotics distribution and who would pay "taxes" for criminal activities. It took its named from the Lowell Avenue area it controlled, bordered by the City of South Pasadena to the north, Stillwell Avenue to the west, Huntington Drive to the south, and the City of Alhambra to the east. At the time of trial, Lowell Street had 34 documented members, a fact Officer Krish learned from department resources. Officer Krish initially testified he had personally met three or four of them and learned none still lived in the area from speaking to them, from speaking to El Sereno gang members, and from the fact that he also had not had contact with Lowell Street members in that area. On cross-examination after speaking with another officer, he testified he could not say for sure whether any members still lived there because they would not be visible in the area due to their "green-light" status (discussed below).

When Lowell Street split from El Sereno, a "green light" on the Lowell Street members was established by the Mexican Mafia, a Hispanic prison gang, for the failure to pay taxes. The "green light" was an order giving permission to jump, assault, or kill any member of a gang without repercussions, a fact Officer Krish learned from tenured detectives, Internet research, and El Sereno and Lowell Street gang members. Also by speaking with tenured detectives, Officer Krish knew the Mexican Mafia prohibited driveby shootings, but that rule did not apply to green-lighted gang members. El Sereno, which was also known as Locke Street, was Lowell Street's main rival.

Officer Krish learned the primary activities of Lowell Street are assault with a deadly weapon; attempted murder; trafficking in methamphetamine, cocaine, and marijuana; weapons-related crimes; and robbery. He did not know the identity of the gang's leader or others in command. But he knew the Lowell Street gang has one hand signal (an "L" shape with the index finger and thumb), shows pride in the color green due to their green-light status, and often "tags" and tattoos the number 12 to signal "L" as the 12th letter of the alphabet. He also took a photograph in December 2009 of graffiti by

the Guardia Street clique on a retaining wall within 200 yards of Lowell Street territory that had been crossed out in orange paint and the letters "LSL" written over them, which stood for Lowell Street Locos. He believed it signaled Lowell Street was active in the area because he patrolled the area all the time, and the graffiti had not been there previously. Lowell Street members would also frequently come back to the area to hang out.

Although Officer Krish had not personally investigated any crimes associated with Lowell Street and did not have personal contact with either appellant, he opined appellants were members of the Lowell Street gang based upon field interview cards, the facts of the incidents at issue, conversations with other officers, and numerous tattoos displayed on appellants' bodies related to the Lowell Street gang. Given a "hypothetical" set of facts based on the circumstances of this case, Officer Krish opined individuals under these circumstances would have been riding in the car with the gun "for the benefit of, at the direction of, or in association with a criminal street gang": they acted in association with a gang because they were two gang members acting together; and they acted for the benefit of the gang because their actions instilled fear in the community and prevented individuals from calling the police. He opined these facts demonstrated "these two gang members" had committed or were about to commit a violent criminal act.

He testified gang members would know gang territories based on conversations with other gang members and from graffiti, and a Lowell Street gang member would know he was in rival territory on Ithaca Avenue where the incident occurred. He stated this activity would enhance the reputation of the Lowell Street gang if there were a general opinion on the street that Lowell Street did not exist anymore, showing Lowell Street was "strong and willing to roll into rival territory." That was true even if no pedestrians or vehicle traffic were present at the time because gang members will still talk about it; a Lowell Street gang member "[w]ill not drive through that area knowing it's not theirs, with bandanas on their face and a loaded gun in the car at five miles an hour and hope that nobody ever finds out. They're there for, like I said, one reason. And they bank on the fact that the community is going to be in fear and rival gang members

7

are going to know that Lowell Street is alive and well." In response to another hypothetical, he stated a person in a gang would still be a gang member, even if he or she moved away from the area, got a bachelor's degree, went to law school and became a lawyer, and returned to the neighborhood to play basketball and drink beers with other gang members.

Officer Krish also testified an individual named Michael Adame, whom he believed to be a Lowell Street gang member, had been convicted of narcotics trafficking in 2009. Although there was no gang allegation in the case and nothing in the police reports indicating Adame was a gang member, Officer Krish based his opinion on field interview cards, speaking with other gang members and gang officers, and a "Lowell" tattoo on Adame's back. He also discussed a specific past incident between the Lowell Street and El Sereno gangs in Alhambra in April 2010 during which three Lowell Street gang members stabbed an El Sereno gang member 12 times. One of the Lowell Street gang members stated during an interview that, "two or three years prior, this individual was involved in a drive-by shooting on Lowell Street and this was their payback."

Parole Agent Daniel Lopez testified he supervised Valadez from November 2009 until he was arrested. He explained that, typically, parolees are assigned to their last legal residence or area where they committed their last crime, and were usually paroled to immediate family members. But Valadez's case was transferred from Los Angeles County to San Bernardino County because of special circumstances regarding potential threats to appellant's life and well-being. Valadez had mentioned to Lopez that "some people" were visiting his father and he felt it was a threatening environment. Lopez told him it was not wise for Valadez to be in that environment and that was why San Bernardino County accepted his transfer. At that time, Lopez discussed Valadez's green-light status with him and informed him as a condition of parole he was not to associate with fellow gang members. Lopez also told him he could not travel outside San Bernardino County without permission. On one occasion, Lopez gave him permission to attend a birthday celebration for a family member, and Valadez took the trip without

issue.  Lopez had not given him permission to leave the county on March 6, 2010, the day of the incident.

Over objection, the trial court admitted the first two pages of a "general chrono," which was a document in Valadez's Department of Corrections file.  It showed Valadez's "residence plan" for parole as first for "Luis Valadez" in Los Angeles, and second for "Virginia Marquez" in Upland, in San Bernardino County.  It also contained a statement from Parole Officer J. Ward reciting a statement from Valadez:  "On November 18, 2009, inmate Valadez was interviewed due to his safety concern.  He stated it would not be safety -- well, safety [*sic*] -- for him to parole to his father's address due to the Mexican Mafia having a green light on him.  They have been asking his father about when he would be getting out of prison.  Because of his gang status regarding the Lowell Street gang, he feels that change in his parole address to Upland would keep his family as well as himself safe from harm."

### 2.  *Uribe's Defense Evidence*

Uribe did not testify.  Paul Kim, a retired LAPD commander, testified on behalf of Uribe that a police report is an important document and should be as accurate as possible.  If, for example, officers pulled a car over for driving at night without headlights, that should be noted in the police report or provided in a supplemental report.  He reviewed the police frequency transmissions in this case and did not find any transmission to or from Officer Lowe's unit, and it would have been out of police policy not to call in when providing backup.  Likewise, no officers broadcast that a gun was thrown out of appellants' car, and if an officer had seen that, the proper procedure would have been to broadcast that fact so responding units can go to that location.  He could not think of a legitimate reason not to broadcast that information when two officers are in the unit, other than an officer is injured and unable to call it in.

Uribe also called former gang member and current California Attorney Humberto Guizar as a gang expert.  He testified he was not sure the Lowell Street gang still existed and, although former members might come back to the area to visit, they were not engaged in gang activity.  The last time he spoke with an active Lowell Street gang

9

member was when Guizar himself was still a gang member 30 years ago. He testified Uribe was not a gang member because he was in his 30's, he had six children, and there was no evidence Uribe had done any gang graffiti or gang signs. He also did not believe Uribe was committing a gang crime when he was arrested because he had never heard of a gang member committing a "hit" while wearing a bandana over his face. He had also never heard Lowell Street had been given a green light. Regarding gang tattoos, he testified current tattoos do not necessarily signal active gang membership and there was a year-and-a-half waiting list for one tattoo removal program and other removal methods could be expensive.

Saul Romero, a "close personal friend" of Uribe, testified that he and Uribe's brother Tony picked up appellant Valadez around 11:00 a.m. the day before his arrest[5] and went to a beauty salon and then Yard House restaurant, where they stayed until around 9:30 or 10:00 p.m. After that, they went to Clancy's in Covina; on the way they called Uribe to ask if he wanted to have drinks for Valadez's birthday, and he eventually met them there. Around 2:00 a.m., Romero and Tony left together, and Uribe said he was going to give Valadez a ride home to his father's house.

LAPD Detective Hector Salas testified he took custody of Uribe after the West Covina Police Department cleared appellants of charges, at which point the LAPD "re-arrested" them on March 8, 2010.

### 3. Valadez's Defense Evidence

Valadez did not testify. He called Daniel Laughlin, a gang expert with 17 years experience, who testified the Lowell Street gang was small, with 25 to 30 members, and it had been inactive for the last nine or 10 years. He also testified most inactive gang members did not remove their gang tattoos and free tattoo removal programs had long waiting lists. He testified Lowell Street was part of El Sereno but it refused to pay taxes

---

**5**    Although Romero testified he picked up Valadez on March 6, appellants were arrested on Saturday, March 6, 2010, at 1:30 a.m. We think in context Romero meant Friday, March 5, 2010.

10

in the 1980's, which was related to their "green light" status. He knew a Lowell Street gang member had been shot and killed three years before trial, but he did not know who had shot him. He testified former gang members are not still gang "banging" in their 30's.

Reuben Lara testified he lived on Ithaca Avenue in El Sereno for 20 years and had seen some graffiti, had occasionally heard gunshots, including a shooting in December 2009 or January 2010, and had seen some "cholos" in the neighborhood, but he had never heard of Lowell Street as a gang. He had never seen either appellant.

Denise Valadez, Valadez's wife whom he had known for five years and married on July 2, 2010, when he was in custody, testified she and Valadez would visit Valadez's father Luis Valadez in El Sereno about every other week, and she would never travel on Ithaca Avenue to get there. Valadez did not work the day before his arrest[6] and his friends picked him up to go to his father's house to help him clean the yard. His birthday had been March 1, and he was going to celebrate with his friends afterward.

Valadez's father, Luis, testified he spoke with Valadez a few days prior to his arrest, and expected Valadez to come to his house that night to help clean. He lived in El Sereno for 44 years and did not see any gang activity on his block. He testified no one had ever come to his house looking for Valadez and he did not know Valadez was a member of the Lowell Street gang, but said Valadez was associated with the gang when he was a teenager. He never saw appellant engage in gang activity and never talked to Valadez about gangs.

### 4. Rebuttal Evidence

The prosecution recalled Detective Salas, who testified booking approval documents reflected appellants were booked for conspiracy to commit assault with a firearm. The prosecution also called LAPD dispatcher and records custodian Jed

---

**6**    Like Romero, Denise Valadez testified Valadez had March 6, 2010, the day of his arrest, off from work. Again, we think in context she meant March 5.

11

Fernandez, who generally testified as to incident recall printouts for the night of the incident.

## DISCUSSION

### 1. *Sufficiency of the Evidence*[*]

Appellants contend insufficient evidence supported their convictions and gang enhancements, and as a result, their due process rights were violated.  In deciding an insufficiency of the evidence claim, we ""*"must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence --* that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on "'isolated bits of evidence.'" [Citation.]'" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329 (*Bradford*); see *People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 316.)  This standard applies when the prosecution relies on circumstantial evidence; in that case, we may not reverse so long as the circumstances reasonably justify the jury's findings.  (*Bradford, supra*, at p. 1329; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1024 (*Vu*).)  These same standards apply to review the sufficiency of the evidence supporting gang enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

### A. *Conspiracy Convictions*

"'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.'" (*People v. Jurado* (2006) 38 Cal.4th 72, 120 (*Jurado*); see *People v. Swain* (1996) 12 Cal.4th 593, 600 (*Swain*).)  Conspiracy does not require commission of the target offense (*Swain, supra*, at p. 599), but it does require both the specific intent to

---

[*] See footnote, *ante*, page 1.

agree to commit the target offense and the specific intent to commit the target offense (*Jurado, supra*, at p. 123). Conspiracy may be proved through circumstantial evidence, so long as it "'supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)

Appellants argue the prosecution did not offer evidence they either intended to conspire or intended to commit the crime of shooting from a vehicle or assault with a firearm. We disagree; viewing the evidence in the light most favorable to the convictions, substantial circumstantial evidence supported their conspiracy convictions. The evidence demonstrated that at 1:50 a.m. appellants, two members of the same gang, drove through their rival gang's territory on Ithaca Avenue at five miles an hour with their lights off and green bandanas over the bottom portion of their faces to conceal their identities, which was a color used as a symbol of the Lowell Street gang. They had a fully loaded handgun in their car, which Valadez threw out the window when they were spotted by Officers Wilson and Bueno. At that point, they sped away before they were pulled over and arrested. Officer Krish's expert testimony demonstrated, as members of the same gang driving through their rival gang's territory, appellants shared a common interest in shooting from their vehicle. From this evidence, the jury could have readily inferred beyond a reasonable doubt appellants harbored both the intent to agree and intent to shoot from their car or assault rival gang members if they saw any. This evidence amply supported appellants' conspiracy convictions.[7]

---

[7] Although it does not impact our decision, we are not persuaded by the Attorney General's reliance on *People v. Muniz* (1993) 16 Cal.App.4th 1083. That case involved similar evidence as here: the defendant sat in a parked car with three fellow gang members and held the butt end of a loaded semiautomatic rifle, and a gang expert testified those circumstances suggest preparation for a driveby shooting. (*Id.* at p. 1088.) But the issue was not whether sufficient evidence supported a conviction; it was whether

13

*B. Gang Enhancements*

The jury found true for both appellants allegations under section 186.22, subdivision (b)(1), which provides: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished" with an additional term of imprisonment. Under the first prong, a felony committed "for the benefit of, at the direction of, or in association with any criminal street gang" requires proof that the underlying crimes were gang-related. (*Albillar, supra*, 51 Cal.4th at p. 60.) Under the second prong, the "specific intent to promote, further, or assist in any criminal conduct by gang members" may be established by the criminal conduct related to the underlying offense, and the defendants need not intend to promote, further, or assist gang-related crime, but only intend to assist, further, or promote criminal conduct by gang members. (*Id.* at pp. 66-67.)

Section 186.22, subdivision (f) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in" subdivision (e) (with certain exceptions not pertinent here), "having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." Section 186.22, subdivision (e) sets out certain offenses that qualify as a "'pattern of criminal gang activity,'" which is defined as "the commission of, attempted commission of,

---

these facts established the corpus delicti of the conspiracy charge necessary to justify admission of the defendant's admissions he was a gang member and had been preparing to commit a driveby shooting. (*Id.* at pp. 1087-1088.) The corpus delicti standard is not proof beyond a reasonable doubt; instead, a "slight or prima facie showing, permitting the reasonable inference that a crime was committed, is sufficient and once this threshold is met, the defendant's admissions may be considered on all issues." (*Id.* at p. 1087.)

14

conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter [(September 23, 1988)] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons."

The term "primary activities" "implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) Sufficient proof of these "primary activities" may consist of "evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute," or testimony from a police gang expert, who bases his or her opinion on conversations with gang members, personal investigations of crimes committed by gang members, and information from law enforcement colleagues. (*Id.* at p. 324, citing *People v. Gardeley* (1996) 14 Cal.4th 605, 620 (*Gardeley*).) We may consider both past and currently charged offenses as part of the gang's "primary activities." (*Sengpadychith, supra*, at p. 323.)

To prove a "pattern of criminal gang activity," the prosecution must establish the commission of two or more enumerated offenses committed on separate occasions or by two or more persons within the specified time frame. (*Gardeley, supra*, 14 Cal.4th at p. 610; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1138 (*Hill*).) The crimes necessary to constitute a pattern of criminal gang activity need not be gang-related. (*Gardeley, supra*, at pp. 621-623; *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611 (*Alexander L.*).) The current offenses may be considered in conjunction with prior crimes by other gang members to establish a pattern of criminal gang activity. (*Gardeley, supra*, at p. 625.)

Substantial evidence supported the jury's finding that the evidence satisfied both the "primary activities" and "pattern of criminal gang activity" requirements. Based on his training, experience, contacts with gang members and other officers, and his

testimony in another Lowell Street gang case, Officer Krish testified the Lowell Street gang undertook activities falling within section 186.22, subdivision (e)(1)-(6), including assault with a deadly weapon; attempted murder; trafficking in methamphetamine, cocaine, and marijuana; weapons-related crimes; and robbery.[8]  In addition to the instant offenses, which he testified were gang-related, he testified to another Lowell Street gang member's involvement in criminal activity:  Michael Adame, who was convicted of narcotics trafficking in 2009.  Although appellants complain the court records for Adame's conviction introduced into evidence did not contain gang allegations, Officer Krish testified Adame was a gang member based upon field interview cards, speaking with other gang members and gang officers, and a "Lowell" tattoo on Adame's back.

Citing *Alexander L.*, appellants argue Officer Krish's testimony lacked foundation and could not have constituted sufficient evidence to establish these requirements.  That case, however, is distinguishable.  In *Alexander L.*, a gang expert testified the gang's primary activities were "quite a few assaults with a deadly weapon, several assaults.  I know they've been involved in murders.  [¶]  I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations." (*Alexander L., supra*, 149 Cal.App.4th at p. 611.)  The expert was asked no further questions and "[n]o specifics were elicited as to the circumstances of these crimes, or where, when, or how [the expert] had obtained the information." (*Id.* at pp. 611-612.)  The court found this testimony lacked foundation and was insufficient to satisfy the gang enhancement statute. (*Id.* at p. 612.)  Here, by contrast, Officer Krish testified to the basis for his opinion, which was sufficient to support the jury's finding.  (*Gardeley, supra*, 14 Cal.4th at p. 620; see also *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330 (*Martinez*); *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 (*Ramirez*).)[9]

---

[8]    The jury was instructed that the pattern of criminal gang activity could be satisfied by assault with a deadly weapon, sale of methamphetamine, and discharging a firearm from a motor vehicle at another person other than the occupant.

[9]    Appellants also suggest there was insufficient evidence the Lowell Street gang even existed in March 2010.  But based on his background and experience, Officer Krish

16

Sufficient evidence also demonstrated appellants' offenses were committed "for the benefit of, at the direction of, or in association with any criminal street gang." Appellants, who were gang members covered in gang-related tattoos, drove slowly through a rival gang's territory with headlights off, green bandanas covering part of their faces signifying their association with Lowell Street, and a loaded handgun in their car. Coupled with Officer Krish's testimony that appellants' acts were associated with the gang and their actions would benefit the gang, this evidence amply demonstrated appellants' offenses satisfied the section 186.22, subdivision (b)(1) gang enhancement. (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1171; *Albillar, supra*, 51 Cal.4th at pp. 63-64; *People v. Jasso* (2012) 211 Cal.App.4th 1354, 1376-1377.)[10]

Uribe separately contends his illegal possession of the handgun under count 3 for being a felon in possession of a firearm could not support a gang enhancement for that count because there was no evidence he was in "constructive" possession of the handgun. "Constructive" possession of a firearm can be satisfied "when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another," such as in a vehicle. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410-411.) Here, although Valadez threw the handgun out of the car and no usable fingerprints were found on it, Uribe was driving the car slowly with headlights off in rival gang territory with a fellow gang member. He accelerated when they spotted Officers Wilson and Bueno and even came to a rolling stop as Valadez threw the gun out of the car. From

testified the Lowell Street gang was active at the time. He even took a photograph of Lowell Street gang graffiti in December 2009, which had not been there before on his patrols of the area, suggesting the Lowell Street gang was indeed active only a few months before the events leading to appellants' arrests. His testimony provided sufficient evidence for the jury to conclude the Lowell Street gang was an active gang.

10      Appellants rely on *In re Frank S.* (2006) 141 Cal.App.4th 1192, but in that case there was no evidence the minor was in gang territory at the time of the crime, had any gang members with him, or intended to use the knife officers found in a gang-related offense. (*Id.* at p. 1199.) That evidence existed here, supporting the gang enhancements. (See *Martinez, supra*, 158 Cal.App.4th at p. 1333 [distinguishing *Frank S.* on similar grounds].)

17

these facts, a jury could readily infer Uribe was aware of the gun and had joint control over it, sufficient to find constructive possession.

Uribe also claims the felon in possession count could not legally support a gang enhancement, relying on *In re Jorge P.* (2011) 197 Cal.App.4th 628, but that case has no application here. There, the court held a minor gang member's misdemeanor conduct of firearm possession in a motor vehicle under former section 12031, subdivision (a)(1) (repealed eff. Jan. 1, 2012, and reenacted as § 25850, subd. (a)) could not also be used as "felonious conduct" necessary to prove a violation of section 186.22, subdivision (a), which in turn would elevate the firearms charge to a felony under former section 12031, subdivision (a)(2)(C) (repealed eff. Jan. 1, 2012, and reenacted as § 25850, subd. (c)). (*Jorge P.*, at p. 638.) None of those provisions are at issue here and Uribe cites no authority to suggest *Jorge P.*'s reasoning extends to this case. Thus, the gang enhancement for Uribe's felon-in-possession count was proper.

## 2. Gang Expert Testimony

Appellants argue Officer Krish's testimony on the background and history of the El Sereno and Lowell Street gangs should have been excluded because it was based upon hearsay and violated their confrontation clause rights. We disagree.

### A. Background

Prior to trial, Uribe's counsel filed a brief arguing a gang expert cannot offer "non-specific" hearsay statements regarding an incident unless the expert has personal knowledge of the incident and can specify "who, when, where and under what circumstances the alleged crimes were committed." The trial court did not immediately rule on the hearsay issue, but when Officer Krish began to testify about the history of the El Sereno gang, appellants' counsel objected for lack of foundation and competency. At sidebar, Valadez's counsel argued Officer Krish's testimony appeared to be "assumptions" predating his experience between 2009 and 2011, so it lacked foundation and rendered his testimony incompetent. Uribe's counsel also argued lack of foundation, and if his testimony was based on hearsay, he wanted to argue his hearsay brief. The court overruled the objections, provided the prosecutor laid "a little more foundation,"

18

such as "if he's talked to other officers, more experienced officers, more senior officers, regarding the formation of El Sereno as well as has he ever talked to the gang[] members about it?" The court rejected the hearsay contention because "he's allowed to rely on hearsay in giving expert opinions" regarding "the background for Lowell Street and El Sereno and the conflict between them," and the court did not "see any reason to exclude that if [the prosecutor] establishes the source of this information and it's adequate."

Uribe's counsel understood "the expert can rely on hearsay in coming to his conclusions about opinions that he has in the case," but "[h]e cannot rely on hearsay to give direct testimony as to I know that El Sereno was started on so and so by so and so because that's not -- that's not why he's being called, and that's not part of the expertise for why the People are calling him." He argued Officer Krish was being called "just to set the stage, I guess, about what the gangs are and what their rivalries are." He recognized Officer Krish "can rely on hearsay in coming to an opinion on whether or not [appellants were] gang members" and whether "what the officers observed when they arrested him were consistent with what a gang member would do." But, according to Uribe's counsel, he could not rely on hearsay to testify to how El Sereno was started. The court inquired further, asking if counsel would object if the prosecutor asked Officer Krish about the Lowell Street split from El Sereno, their rivalry, and the green light, to which counsel responded Officer Krish could testify if he had personal knowledge of those subjects. The court wondered how Officer Krish would have personal knowledge other than the information provided by gang members and other officers. Uribe's counsel responded, "That's not my problem," and noted if Officer Krish had been out in the field doing consensual stops and gathering information, then he could testify to it. Valadez's counsel added Officer Krish could testify to "hearsay facts," but could not testify to what officers and other gang members told him. The court overruled the objections, subject to proper foundation.

Officer Krish then testified he became familiar with the history of El Sereno through "verbiage and literature that you read from department resources about the gang. [¶] I've talked to gang officers. I've talked to gang detectives with 30 years on the job. I

19

talked to gang members themselves in the street during consensual encounters, talk to them about what I read, what I heard, what I learned, what I believe I know. And run it by them and confirm the information that I know." He testified he relied on similar sources to learn about Lowell Street. He testified on cross-examination officers he spoke with got their information from the same sources, including speaking with gang members, and that it is possible gang members might lie, although he could not remember an instance of a Lowell Street gang member lying.

When he was recalled, Officer Krish testified appellants were gang members "[b]ased on self admissions, based on field interview cards that I reviewed, based on the facts of this incident, based on my conversations with the other officers, the tattoos that the two defendants display." At sidebar, Valadez's counsel objected on confrontation clause, due process, and other grounds, and Uribe's counsel renewed his hearsay objection, all of which were overruled.

## B. California Law

Under Evidence Code section 801, subdivision (b), an expert witness may base an opinion on "matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." California law permits gang experts to rely on reliable hearsay evidence to form an opinion, even if the evidence would otherwise be inadmissible. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 944-946 (*Gonzalez*); *Gardeley, supra*, 14 Cal.4th at pp. 617-618.) Sources can include written material and conversations with gang members and other officers. (*Gonzalez, supra*, at p. 949; *Sengpadychith, supra*, 26 Cal.4th at p. 324; *Gardeley, supra*, at p. 620; *Hill, supra*, 191 Cal.App.4th at pp. 1122-1126 (*Hill*); *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1209-1210 (*Thomas*); *People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9.) We review the trial court's admission of expert testimony for abuse of discretion. (*Hill, supra*, at p. 1122.)

20

The trial court did not abuse its discretion in admitting Officer Krish's opinions on the general history of the El Sereno and Lowell Street gangs. Officer Krish had been an officer for six and a half years, and spent almost two years in a gang enforcement division. He kept up to date on gang activities in the Hollenbeck division by gathering intelligence on gangs in the area, identifying and tracking gang members and their activities, working with other officers and gang detectives, conducting searches on gang members, and investigating gang-related crimes. He had training on gang awareness, and he had contact with gang members on a daily basis. He relied on the same types of sources other courts have found appropriate for gang expert testimony, that is, conversations with gang members and officers, as well as written materials. And while individual sources such as gang members might be reasonably questioned, he did not rely on these sources alone or simply recite statements by others; he fit the information into all the other sources and his own experience to render his opinion. (*Hill, supra*, 191 Cal.App.4th at pp. 1124-1125.) Even Valadez's gang expert Laughlin testified about Lowell Street's failure to pay taxes and the split from El Sereno, corroborating Officer Krish's testimony. The trial court therefore properly admitted Officer Krish's expert testimony under California law.

*C. Confrontation Clause*

Officer Krish's testimony also did not violate appellants' confrontation clause rights.[11] As discussed above, California law permits gang experts to rely on otherwise inadmissible hearsay in forming opinions. In *Gardeley*, which did not involve the confrontation clause, the court suggested such "basis" evidence is not offered for its truth, but only to reveal the basis for the expert opinions. (*Gardeley, supra*, 14 Cal.4th at p. 619 [noting trial courts have discretion to limit expert questioning "because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact"].) Eight years after *Gardeley*, the United States Supreme Court decided *Crawford v. Washington* (2004) 541 U.S. 36,

---

[11]    We requested and received supplemental briefing on this issue from the parties.

21

59 (*Crawford*), holding the admission of testimonial out-of-court statements violates a defendant's confrontation rights unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*People v. Lopez* (2012) 55 Cal.4th 569, 576 (*Lopez*).) *Crawford* makes clear, however, the confrontation clause does not apply to out-of-court statements not offered for their truth. (*Crawford, supra*, at p. 59, fn. 9; *Thomas, supra*, 130 Cal.App.4th at p. 1210.)

Courts since *Crawford* have interpreted *Gardeley*'s suggestion that gang expert basis evidence is not offered for the truth to defeat confrontation clause challenges under *Crawford*. (*Hill, supra*, 191 Cal.App.4th at pp. 1127-1128; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153-154; *Ramirez, supra*, 153 Cal.App.4th at pp. 1426-1427; *Thomas, supra*, 130 Cal.App.4th at p. 1210.) In *Thomas*, for example, the court cited *Gardeley* and rejected a confrontation clause challenge to a gang expert's reliance on conversations with gang members in forming opinions because "experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Thomas, supra*, at p. 1210.) In *Hill*, the defendant argued several out-of-court statements supporting a gang expert's opinions were admitted for their truth and subject to the confrontation clause. (*Hill, supra*, at p. 1127.) Relying on *Thomas*, the trial court admitted the statements because they were not introduced for their truth, but only to assist the jury in evaluating the expert's opinion. (*Ibid.*) Though the court of appeal "disagree[d] with *Thomas*'s analysis of this important issue, *Thomas* appropriately relies on relevant Supreme Court precedent, principally *Gardeley* . . . , that we are required to follow," so the court felt compelled to reject the defendant's challenge. (*Ibid.*)

In a lengthy discussion, however, the court in *Hill* disagreed with the idea that expert basis evidence is not offered for its truth for confrontation clause purposes. (*Hill, supra*, 191 Cal.App.4th at pp. 1127-1128.) In its view, "[c]entral to the reasoning in

22

*Gardeley* and *Thomas* is the implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements. Otherwise, the conclusion that the statements should remain free of *Crawford* review because they are not admitted for their truth is nonsensical. But this assumption appears to be incorrect." (*Id.* at pp. 1129-1130.) Relying on a New York case, the court suggested when basis evidence consists of out-of-court statements "the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Id.* at p. 1131.) As for the specific out-of-court statements at issue, the court suggested if the basis evidence is in fact offered for its truth and subject to the confrontation clause, most of the evidence on which the gang expert relied would not be "testimonial" because it consisted of consensual conversations with gang members and did not involve the investigation of any particular crimes. (*Id.* at pp. 1135-1136.)

Since *Hill*, a majority of justices on both the United States Supreme Court and our high court have indicated expert basis evidence is offered for its truth and subject to the confrontation clause. (*Williams v. Illinois* (2012) 567 U.S. __, 132 S. Ct. 2221 (*Williams*); *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*).) In *Williams*, the defendant challenged a laboratory expert's testimony that a DNA report from a prior kidnapping, rape, and robbery -- which was not introduced into evidence -- matched a DNA sample taken from the defendant upon his arrest on unrelated charges. In a 4-1-4 decision, the court held there was no confrontation clause violation but a majority of justices could not agree on a rationale. Justice Alito, in a plurality opinion joined by the Chief Justice and two other justices,[12] reasoned the report was not offered for its truth, but for the limited purpose of explaining the basis for the assumptions underlying the expert's independent conclusion that the samples matched, and even if it was admitted into evidence for its truth, the report was not testimonial. (*Williams, supra*, 132 S. Ct. at p. 2228 (plur. opn. of Alito, J.).) The five other justices in two opinions (Justice Thomas, concurring in the

---

[12]    Justice Breyer wrote a concurring opinion while also joing Justice Alito's opinion "in full." (*Williams, supra*, 132 S.Ct. at p. 2252 (conc. opn. of Breyer, J.).)

23

judgment, and Justice Kagan, joined by three other justices, dissenting) all expressed the view the report was offered for its truth, although Justice Thomas found it was not testimonial, while the dissenting Justices found it was. (*Id.* at pp. 2257 ["[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose."], 2260 (conc. opn. of Thomas, J.); *id.* at pp. 2268, 2271 [the expert's description of the report "was offered for its truth because that is all such 'basis evidence' can be offered for"], 2273 (dis. opn. of Kagan, J.).)

In *Dungo*, a forensic pathologist testified the victim in the case had been strangled, basing his opinion on facts contained in an autopsy report by another pathologist, which was not introduced into evidence. (*Dungo, supra*, 55 Cal.4th at pp. 618-619.) The majority opinion, written by Justice Kennard and joined by the Chief Justice and three other justices, concluded the statements in the autopsy report were not testimonial, and therefore not subject to the confrontation clause. (*Id.* at p. 621.) That opinion did not address the hearsay issue, although it noted the *Williams* plurality's nonhearsay rationale. (*Id.* at p. 618.) Justice Werdegar wrote a concurring opinion, however, which garnered majority support (joined by the Chief Justice and two other justices), explaining the statements in the report were offered for their truth, so they were subject to the confrontation clause. (*Id.* at p. 627 (conc. opn. of Werdegar, J.).) In dissent, Justice Corrigan, joined by Justice Liu, noted, "When an expert witness treats as factual the contents of an out-of-court statement, and relates as true the contents of that statement to the jury, a majority of the high court in *Williams* . . . rejects the premise that the out-of-court statement is not admitted for its truth." (*Id.* at p. 635, fn. 3 (dis. opn. of Corrigan, J.).)

If the currently constituted courts were called upon to resolve this issue, it seems likely the holdings in *Thomas*, *Hill*, and other cases extending *Gardeley* to find out-of-court statements offered as expert basis evidence are not offered for their truth for

24

confrontation purposes will be significantly undermined.[13]  But we need not decide the issue.  Assuming the general out-of-court statements on which Officer Krish relied in testifying to the background of the El Sereno and Lowell Street gangs[14] were offered for their truth as appellants contend, they were not testimonial under the confrontation clause.

To be subject to the confrontation clause, out-of-court statements must be "testimonial." (*Crawford, supra*, 541 U.S. at p. 59.)  In *Crawford*, the court declined to give a comprehensive definition of testimonial statements, although it stated at a minimum the confrontation clause applies to "'prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations,'" which, under the facts of the case, included recorded statements by a witness in response to structured police questioning.  (*People v. Cage* (2007) 40 Cal.4th 965, 978 (*Cage*) [explaining *Crawford*].)  In *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*), the court reviewed confrontation clause challenges in two cases:  one involved out-of-court statements by a domestic violence victim on a 911 call describing the attack as it occurred, which the court held were not testimonial; and the other involved a victim's statements to officers in response to questions after a domestic violence incident had ended, which the court held were testimonial.  (*Cage, supra*, at pp. 980-981 [describing facts in *Davis*]; *People v. Barba* (2013) 215 Cal.App.4th 712, 721 (*Barba*) [same].)  Without providing an exhaustive list of testimonial statements, the court held:  "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the

---

[13]     This does not mean *Gardeley*'s holding that an expert may rely on inadmissible hearsay as a matter of state evidentiary law is no longer a viable rule.  Our discussion here is limited to the implications of expert testimony under the confrontation clause.

[14]     Officer Krish did not testify to specific out-of-court statements, but we agree with appellants that those statements were implicit in his testimony.

25

interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra*, at p. 822; see also *Michigan v. Bryant* (2011) __ U.S. __, __, 131 S. Ct. 1143, 1157 (*Bryant*).)

Following *Davis*, the court in *Cage* found a victim's statement made to an officer one hour after an assault was testimonial because the primary purpose was to investigate the crime, but the court found nontestimonial a statement to a doctor for immediate treatment of an injury. (*Cage, supra*, 40 Cal.4th at pp. 984-987.) The court derived "several basic principles" from *Davis*: "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony -- to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Cage*, at p. 984, fns. omitted.)

In *Bryant*, the court clarified the meaning of *Davis*'s requirement that "'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency'" in the context of statements by a mortally wounded victim to officers arriving at the scene. (*Bryant, supra*, 131 S. Ct. at pp. 1150, 1156.) Our high court in *People v. Blacksher* (2011) 52 Cal.4th 769 (*Blacksher*) interpreted *Bryant* in a case involving an ongoing emergency and set out six factors to determine the "primary

26

purpose" of police questioning. (*Id.* at p. 811-816.) Although several of the factors related specifically to the circumstances of an emergency, which was not present here, two of the other factors guide our inquiry. Under *Bryant,* we "must objectively evaluate the circumstances of the encounter along with the statements and actions of the parties," and "'the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions' in the given situation." (*Id.* at p. 813.) The inquiry focuses on the *primary* purpose of the questioning, even though in emergency situations the parties may have mixed motives of both responding to an emergency and investigating a crime. (*Id.* at p. 814.) Moreover, "regardless of the existence of an emergency, the informality of the statement and the circumstances of its acquisition are important considerations." (*Id.* at 815.)

Most recently, several cases, including *Williams*, *Lopez*, and *Dungo*, addressed confrontation clause challenges to expert testimony based on forensic evidence. In *Williams*, one of the grounds on which the plurality found no confrontation clause violation was that the report on which the expert relied was prepared for the primary purpose of finding a dangerous rapist still at large, not to target an accused individual. (*Barba, supra*, 215 Cal.App.4th at p. 719, citing *Williams, supra*, 132 S. Ct. at p. 2243 (plur. opn. of Alito, J.).) In his concurring opinion, Justice Thomas found no confrontation clause violation because the report "lack[ed] the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact." (*Williams, supra*, at p. 2260 (conc. opn. of Thomas, J.); see *Barba, supra*, at p. 720.)

Interpreting *Williams* and two other recent cases,[15] our Supreme Court in *Dungo* and *Lopez* formulated a two-part test to determine whether an out-of-court statement is testimonial: "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose

---

[15]     *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 and *Bullcoming v. New Mexico* (2011) 564 U.S. __, 131 S. Ct. 2705.

27

pertains in some fashion to a criminal prosecution." (*Dungo, supra*, 55 Cal.4th at p. 619; see *Lopez, supra*, 55 Cal.4th at pp. 581-582.) The court recognized the United States Supreme Court has not agreed on a precise definition for either requirement. (*Dungo, supra*, at p. 619; *Lopez, supra*, at p. 582.) In *Dungo*, the court held statements in an autopsy report the testifying expert used to reach independent conclusions (but which was not itself admitted into evidence) met neither requirement because the objective facts in the report were not sufficiently formal to be testimonial, and the primary purpose of the report was not to target an accused individual, but to provide an official explanation for an unusual death. (*Barba, supra*, 215 Cal.App.4th at p. 721 [explaining *Dungo*].[16]) In *Lopez*, the court held machine-generated results and chain-of-custody notations in a lab report admitted into evidence and used by an expert to render an opinion on the defendant's blood alcohol level was not sufficiently formal to be testimonial because there was no attestation of validity and there was no way to cross-examine the machine that generated the results. (*Barba*, at p. 720 [explaining *Lopez*].)

Although the out-of-court statements on which Officer Krish relied as an expert witness do not fall neatly into either the *Davis* line of cases involving statements to officers during emergencies or the *Williams* line of cases involving expert testimony based on forensic evidence, we think under any definition of "testimonial" the general background information he obtained from gang members, other officers, and written materials on the history of the El Sereno and Lowell Street gangs plainly does not qualify. Officer Krish testified he simply talked to experienced officers, read materials,

---

[16]    In his concurring opinion in *Dungo* joined by three other justices, Justice Chin provided further guidance on how to interpret *Williams*. (*Dungo, supra*, 55 Cal.4th at pp. 627-628 (conc. opn. of Chin, J.).) Because neither the plurality opinion nor Justice Thomas's concurring opinion could be considered a logical subset of the other, even though they made up the holding of the court, "we must determine whether there was a confrontation clause violation under Justice Thomas's opinion *and* whether there was a confrontation clause violation under the plurality's opinion. If there was no violation under both opinions, then the result (finding no confrontation clause violation) would command the support of a majority from the high court's *Williams* case." (*Id.* at p. 629; see *Barba, supra*, 215 Cal.App.4th at pp. 723-724 [following J. Chin's concurrence].)

28

and discussed the gangs' history in casual, consensual encounters with gang members in order to learn more about the history of the gangs, which gang expert witnesses almost surely must do to become qualified as experts. There is no evidence to suggest any of this information bore any degree of solemnity or formality as required by Justice Thomas in *Williams* or by the court in *Dungo* and *Lopez*, or resembled in any way formal dialogue or interrogation as discussed in *Davis* and other cases.

Further, nothing in the circumstances of Officer's Krish's interactions with gang members and other officers objectively indicates the primary purpose of Officer Krish's questioning was to target appellants or any other individuals or crimes for investigation or to establish past facts for a later criminal prosecution. Officer Krish testified he never had any personal contact with appellants and never investigated any Lowell Street crimes. To the contrary, he merely educated himself about the history of gangs in an area in which he was assigned as a gang officer, which would help him better understand and perhaps more effectively investigate gang activity. Like the mixed motives of officers and witnesses during ongoing emergencies, that he used this general information to testify as a gang expert at trial does not mean his *primary purpose* in obtaining this information was to use it against appellants in a later criminal prosecution. Day in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some unspecified criminal prosecution. Further, nothing in the consensual encounters with gang members or officers suggests they might have reasonably understood Officer Krish's primary purpose was to use their statements in a later prosecution. This information is of a wholly different character than the information officers obtained from the witnesses in *Davis* and other cases, and it implicates the confrontation clause even less than the DNA report in *Williams*, which according to the plurality had a primary purpose of finding a rapist, or

29

the autopsy report in *Dungo* with its primary purpose to provide an official explanation of an unusual death.[17]

Here, appellants' confrontation clause challenge is limited to Officer Krish's reliance on general background information from written materials and casual, consensual conversations with gang members and other officers about the history of the Lowell Street and El Sereno gangs, none of which implicates the formality and primary purpose aspects of the confrontation clause. Because this information, which is the same type of information gathered and used by every gang expert in the field, cannot be considered testimonial, Officer Krish's testimony did not violate appellants' confrontation clause rights. (See *Hill, supra,* 191 Cal.App.4th at pp. 1135-1136.)

### 3. Evidentiary Claims[*]

#### A. Testimony from Valadez's Parole Officer and the "General Chrono"

Valadez argues testimony from his parole officer and the "general chrono" authored by J. Ward were improperly admitted and violated his rights to due process and a fair trial. Prior to trial, the prosecution moved in limine to introduce the statements by Valadez to his parole officer J. Ward contained in the general chrono, in which he requested he be paroled to Upland instead of his father's house because Mexican Mafia members had been asking his father about him and it would not be safe for him there due to his gang status and the Mexican Mafia's green light on him. At the hearing on the motion, Valadez's attorneys objected that the statement was "not clear" about future violent actions and that it was more prejudicial than probative. The prosecutor argued it

---

[17]     Although there was no ongoing emergency in this case as discussed in *Davis* and *Cage*, "whether an ongoing emergency exists is simply one factor -- albeit an important factor -- that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." (*Bryant, supra*, 131 S. Ct. at p. 1160.) Consistent with *Dungo* and *Lopez*, *Davis* and *Cage* still required a primary purpose "to establish or prove some past fact for possible use in a criminal trial," and that purpose is absent here. (*Cage, supra*, 40 Cal.4th at p. 984; see *Hill, supra*, 191 Cal.App.4th at p. 1136 [applying *Davis* and *Cage* to gang expert basis evidence].)

[*]     See footnote, *ante*, page 1.

was probative of lack of mistake in being in the area and of the gang allegation. Valadez's attorneys responded mistake was not contrary to Valadez's defense. The trial court granted the motion, agreeing with the prosecutor that Valadez's statement was relevant to lack of mistake in being in the area and to the gang allegation because it tended to prove Valadez was in the area with Uribe to commit a crime. The court also found the probative value was not substantially outweighed by the potential for unfair prejudice because the jury would already hear evidence Valadez had a parole agent and had been convicted of a felony as part of the felon in possession of a firearm charge.

At trial, agent Lopez testified he supervised Valadez since November 2009 after his transfer due to special circumstances regarding potential threats to appellant's life and well-being if he stayed in Los Angeles County. He stated the general chrono was usually created in the ordinary course of business of the Department of Corrections when there is a special request or special circumstance; it is generated at the time of the request and kept in the parolee's file. He explained Valadez's general chrono was created by J. Ward, a counselor at Valadez's institution, and it went in Valadez's file. At that point, Valadez's counsel objected to the document on the ground it contained double hearsay, but the court overruled the objection, finding the document relevant to Valadez's knowledge and awareness of a rivalry between the Lowell Street and El Sereno gangs and admissible over the hearsay objection because it was a public record and an admission by a party. Lopez further testified he discussed Valadez's green-light status with him, and told him he could not travel outside San Bernardino County without permission or associate with gang members. And Lopez testified Valadez told him some "people" were visiting his father, and Lopez told him it was not a good idea for him to be in that area.

Valadez argues the trial court improperly admitted Lopez's testimony about what he said to Valadez because it was hearsay not within an exception. The Attorney General responds this was not hearsay because Lopez was available for cross-examination and observed by the jury. The Attorney General is incorrect because a witness's prior statement may be hearsay even if the witness testifies and is available for cross-examination. (Evid. Code, § 1200, subd. (a) [defining hearsay as a statement "made

31

other than by a witness while testifying at the hearing . . . offered to prove the truth of the matter stated"].)  But in the trial court Valadez's counsel only objected on hearsay grounds to one statement by Lopez -- his testimony he told Valadez he could not leave San Bernardino County without permission.  Valadez's counsel's failure to timely and specifically object to Lopez's other testimony forfeited those challenges.  (Evid. Code, § 353, subd. (a); *People v. Tully* (2012) 54 Cal.4th 952, 1010 (*Tully*).)[18]  As to the one statement to which the objection was preserved, it was not offered for the truth of the matter but only to show Valadez had been warned it was dangerous to be in the area.  In any event, any error was harmless because the statement was minimally probative of the material issues and the evidence of Valadez's guilt was strong.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

Valadez argues the trial court improperly admitted the statements in the general chrono because they were irrelevant and unduly prejudicial under Evidence Code section 352.  We disagree.  """"The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.] [¶] Defendant placed all material issues in dispute by pleading not guilty.'"  (*Tully, supra*, 54 Cal.4th at p. 1010.)  If relevant, Evidence Code section 352 permits the trial court to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  "We will not disturb a trial court's exercise of discretion under Evidence Code section 352 unless the defendant affirmatively shows that the court exercised its discretion '"in an arbitrary, capricious or patently absurd manner."'"  (*People v. Escudero* (2010) 183 Cal.App.4th 302, 310 (*Escudero*).)

---

**18**    We reject Valadez's attempt to avoid forfeiture by arguing in a cursory footnote in his opening brief the failure to object constituted ineffective assistance of counsel. (*People v. Williams* (1997) 16 Cal.4th 153, 206.)

Valadez's statement in the general chrono was highly probative to prove he was not in the El Sereno area in which he was arrested due to mistake, that he intended to commit a crime while there, and that he was a member of the Lowell Street gang. While Valadez argues mistake and intent were not at issue, his not guilty plea put all material issues in dispute and the prosecutor was entitled to offer the general chrono to prove his intent and rebut the possibility that he was mistakenly in a rival gang's territory when he was arrested. (*Escudero, supra*, 183 Cal.App.4th at p. 313.) The trial court also properly exercised its discretion under Evidence Code section 352 because the general chrono was not cumulative and was only potentially prejudicial because it would show appellant was on parole in November 2009, a fact that was already before the jury from Lopez's testimony and as part of the felon-in-possession charge. Thus, Valadez's claim fails.

## B. *Evidence of Uribe's Association with the Mongols Gang*

Uribe argues the trial court violated his due process rights by improperly admitting evidence he was associated with the Mongols gang. The issue of the Mongols gang was first mentioned in cross-examination of Valadez's gang expert Guizar, who testified the Mongols were a motorcycle gang, and that any association between Lowell Street gang members was unbelievable. Later, before Officer Krish was recalled to testify, Uribe's counsel objected to the prosecutor's proposal to introduce a series of photographs showing Valadez's tattoos, many of which were Lowell Street gang-related, and at least one of which related to the Mongols gang. Uribe's counsel claimed they were cumulative, and Valadez's counsel later joined the objection. The court overruled the objection under Evidence Code section 352. No one specifically raised the issue of the Mongols gang at that time.

The prosecutor then showed Officer Krish one of the photographs of a tattoo on Valadez depicting a bald man wearing sunglasses, which Officer Krish identified was a Mongols gang tattoo. Officer Krish explained the Mongols gang was a motorcycle gang founded in 1969 and the "only information" he had of any association between it and the Lowell Street gang was a comment he heard during a California Gang Investigators'

33

Association seminar from Mexican Mafia defector Rene Enriquez (or Rene Boxer) that the Mongols gang recruited from the Lowell Street gang.

The trial court stopped the questioning and held a sidebar, expressing concern about the testimony and photographs related to the Mongols gang. The court ruled that, given the only evidence of a connection between the Mongols and Lowell Street gangs appeared to be one remark from a former Mexican Mafia member, the probative value of the Mongols gang evidence under Evidence Code section 352 was "nil." The court invited a motion to strike the testimony and evidence, which appellants' counsel made and the court granted. The court then instructed the jury "to disregard and not to consider the testimony about anything about tattoos of the Mongols. Just put it out of your mind." The photographs of Valadez's Mongol gang tattoos were not admitted into evidence.

Uribe's challenge to this evidence fails because the trial court immediately excluded it and instructed the jury not to consider it, so no undue prejudice resulted from the jury's brief exposure to it. Indeed, the photographs of *Valadez's* tattoos did not directly link Uribe to any evidence regarding the Mongols gang, minimizing any possible prejudice to Uribe. We presume the jury followed the court's instructions to disregard this evidence, so it was not reasonably probable Uribe would have obtained a more favorable outcome absent the error. (*People v. Burgener* (2003) 29 Cal.4th 833, 870; *Watson, supra*, 46 Cal.2d at p. 836.)

### 4. *Prosecutorial Misconduct Claims*[*]

Appellants claim the prosecutor committed misconduct in several ways. A prosecutor commits misconduct in violation of the federal Constitution when a series of acts comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679 (*Fuiava*); *People v. Hill* (1998) 17 Cal.4th 800, 819.) Under state law, a prosecutor commits misconduct if he or she uses deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*Fuiava, supra*, at p. 679.)

---

[*] See footnote, *ante*, page 1.

Prosecutorial misconduct that does not rise to a federal constitutional violation will warrant reversal only if it was reasonably probable a result more favorable to the defendant would have resulted absent the misconduct. (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323-1324.) An appellant may not raise a claim of prosecutorial misconduct on appeal "'unless in a timely fashion -- and on the same ground -- the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]' [Citation.]" (*People v. Hill, supra*, at p. 820; see also *Fuiava, supra*, at p. 679.) The failure to timely object may be excused if objecting would have been futile or a jury admonition would not have cured the harm caused by the misconduct. (*People v. Hill, supra*, at p. 820; see also *Fuiava, supra*, at p. 680.)

A. *Questioning of Gang Expert Officer Krish*

Appellants argue the prosecutor committed misconduct by eliciting testimony from gang expert Officer Krish regarding appellants' intent the night of their arrest. Called out of order for scheduling reasons, Uribe's gang expert Guizar testified if two gangs had a conflict, they might "flip each other off or do something like that," and that conflict typically would not escalate to "very hard-core violence." After Guizar testified, Officer Krish retook the stand and the prosecutor posed a hypothetical question to Officer Krish based on the evidence in this case. As part of that hypothetical, the prosecutor directed Officer Krish to assume appellants were the individuals in the hypothetical scenario. The prosecutor then asked, "Based on that hypothetical, do you have an opinion as to whether or not those two defendants were riding in that car with that gun for the benefit of, at the direction of, or in association with a criminal street gang?" Officer Krish responded, "there's only one reason that a Lowell Street gang member would be in an area they know is not theirs. They know that it is a rival gang's location. The fact that two Lowell Street gang members are together during this incident or during this time shows that it is in association, two individuals in association with a criminal street gang. [¶] For the benefit -- it benefits the gang in that, when these criminal acts are conducted, they place the community, they place rival gangs in constant fear. And the gang

35

members bank on this because they know, if the community is kept in constant fear, they will be less likely to report, to call the police, allowing gang members to . . . [¶] . . . [¶] . . . continue their criminal activity within areas."

The prosecutor proceeded, "And would you expect these two gang members to be in this area at 1:30 in the morning armed with a fully loaded handgun, to be there to flip somebody off?" Officer Krish answered, "Absolutely not." The prosecutor asked, "What would you expect would occur?" The court overruled Uribe's counsel's objection that the question was vague, and Officer Krish answered, "They're there, like I said, for one reason. That's that they already committed a criminal act. They're about to commit a violent criminal act . . . ."

Uribe's counsel objected at that point that the answer lacked foundation and called for speculation. The court called counsel to sidebar, and raised a concern that the prosecutor was "getting into testimony as to what it was [appellants] were there to do." The prosecutor argued the question was not about appellants specifically, but about two Lowell Street gang members in that particular situation. The court was still concerned the questions related to the ultimate fact in issue of appellants' intent, and struck Officer Krish's last answer. The court noted Officer Krish could give an opinion on the issue of "whether or not [appellants] were acting for the gang and in association with a gang with the intent. But . . . especially on a case like this, where it's circumstantial, I think, it's inappropriate for him to give an opinion as to what was in their minds and what they were intending to do and you can argue that from the circumstances of your evidence." The court also relied on Evidence Code section 352, precluding "questions as to the ultimate fact in issue, namely what they were conspiring to do. And you have plenty of circumstantial evidence to argue from. And I think it's inappropriate for him to interpret that circumstantial evidence as the jury's function. I'll strike the last answer." The court instructed the jury the last answer was stricken and should be disregarded, and the prosecutor moved on to other questioning.

Appellants did not object to Officer Krish's testimony on misconduct grounds, so this argument was forfeited. (*People v. Erickson* (1997) 57 Cal.App.4th 1391, 1403

36

(*Erickson*).)  Even on the merits, any alleged misconduct did not prejudice appellants. Officer Krish's stricken testimony on appellants' criminal intent the night of their arrest may have been improper, given the jury was as competent as Officer Krish to draw an inference on appellants' intent.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551.)  But when the prosecutor elicited this testimony, the court promptly ended the line of questioning, struck Officer Krish's last answer, and instructed the jury to disregard it.  (*People v. Abel* (2012) 53 Cal.4th 891, 925-926 (*Abel*).)  Under the circumstances, any error was harmless.  (*Watson, supra*, 46 Cal.2d at p. 836.)

## B.  Griffin *Error*

Appellants argue the prosecutor also committed misconduct by improperly commenting in closing arguments on their failure to explain what they were doing in the El Sereno area at 1:55 a.m., which violated their constitutional rights under *Griffin v. California* (1965) 380 U.S. 609.  During opening statements, Uribe's counsel told the jury Uribe was on Ithaca Avenue because he intended to stop off at the house of a "girl [who] who lived up the hill," and Ithaca Avenue was the only way to get there.  During closing arguments, Valadez's counsel commented he believed there was testimony Uribe was in the area "for some people that or some lady that he knew in that area."  In rebuttal, the prosecutor argued, "And going back to the ability to subpoena witnesses to come to court, ladies and gentlemen, remember at opening statement, when [Uribe's counsel] got [up] before you and said 'You're going to find out they were going to visit a lady.'  They provided witnesses that were with the defendants before at the bar.  And they provided a witness, Mr. Valadez, who lives nowhere near Ithaca.  Where is this lady?  Weren't you waiting for her to walk in the courtroom and testify?  [¶]  Did they give you any explanation, any witness to say what they were doing there at 1:50 in the morning?"

Uribe's counsel objected on the ground the argument shifted the burden of proof to appellants, and the court held a sidebar.  The court noted the issue was "sticky" and the prosecutor had "an absolute right to comment on the failure to call logical witnesses once they've called witnesses," but not the "right to comment on [appellants'] own silence."

37

The court then instructed the jury appellants had an absolute right not to testify and they chose to exercise that right, so the jury may not consider their silence as evidence of anything. The court also reminded the jury the prosecutor always has the burden of proof beyond a reasonable doubt and the burden does not shift to the defense.

Once again, appellants failed to object in the trial court on misconduct grounds, so they forfeited this claim. (*Erickson, supra*, 57 Cal.App.4th at p. 1403.) On the merits, we find no error warranting reversal. Considered in context, the prosecutor's brief comment could not have been reasonably understood to refer to appellants' failure to testify. (*People v. Benson* (1990) 52 Cal.3d 754, 793.) To the contrary, it clearly referred to appellants' failure to call a logical witness who had previously been mentioned -- the "girl [who] lived up the hill" -- which was a proper subject of argument, as the trial court correctly noted. (*People v. Wash* (1993) 6 Cal.4th 215, 262-263.) And even if improper, the prosecutor's comments were not prejudicial, given the trial court instructed the jury not to consider appellants' failure to testify as evidence of anything and the prosecution always bore the burden of proof. (*Watson, supra,* 46 Cal.2d at p. 836.) This isolated remark on the absence of a witness was a far cry from *People v. Guzman* (2000) 80 Cal.App.4th 1282, 1288-1290, cited by appellants, in which the prosecutor "repeatedly and flagrantly denigrated" the defendant's right to remain silent by repeatedly referring to another witness's willingness to testify. Thus, appellants' claim fails.

*C. Mongols Gang Evidence*

Separate from Uribe's evidentiary claim discussed above, Uribe argues the prosecutor committed misconduct by eliciting evidence regarding the Mongols gang. Uribe forfeited this argument by failing to object on misconduct grounds, but even on the merits, the claim fails. Uribe is correct a prosecutor may not intentionally elicit inadmissible evidence. (*Abel, supra*, 53 Cal.4th at p. 925.) Here, however, there is nothing to suggest the prosecutor intentionally sought to present inadmissible evidence of the Mongols gang; instead, the prosecutor explained she believed Officer Krish was only going to testify the Mongols gang was also green-lighted by the Mexican Mafia, and she apologized for eliciting testimony beyond that topic. In any case, the trial court cut this

38

questioning short, struck the Mongols gang testimony, and instructed the jury not to consider any of the Mongols gang evidence. (*Id.* at pp. 925-926.) And as noted above, there was no evidence to directly link Uribe to the Mongols gang evidence, so he was not prejudiced by the brief reference to it. (*Watson, supra*, 46 Cal.2d at p. 836.)

### D. Cumulative Prejudice

Appellants further argue the cumulative effect of the prosecutor's misconduct warrants reversal. We disagree. Any arguable instances of error do not approach a "clear showing of a miscarriage of justice." (*People v. Hill, supra*, 17 Cal.4th at p. 844.)

### 5. *Valadez's Ineffective Assistance of Counsel Claims**

Valadez argues various acts and omissions by his two attorneys -- Jerry Fernandez and Azar Elihu -- violated his Sixth Amendment right to effective assistance of counsel. In order to prevail on this claim, Valadez must show "(1) his . . . trial counsel's representation fell below an objective standard of reasonableness and (2) he . . . was prejudiced (i.e., there is a reasonable probability that a more favorable determination would have resulted in the absence of counsel's deficient performance)." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372, citing, inter alia, *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

### A. Carjacking Evidence and Defense Theory

Valadez first argues his counsel failed to present evidence that there was no carjacking and presented a defense theory without evidentiary support. Valadez's defense theory was that officers lied about the events on the night of his arrest and, after they could not hold appellants for carjacking, they fabricated a reason to arrest them. This theory was supported by evidence that officers did not write in their reports that appellants' car was moving slowly with its headlights off, and they did not broadcast over the radio a gun was thrown from the car.

In opening statements, Elihu told the jury the evidence would show Uribe was dropping Valadez off at his father's house and they were spotted by police because they

---

* See footnote, *ante*, page 1.

39

were driving a "crappy car, a 1993 Honda" with its lights on and they were not driving that slowly, but they were spotted because "they look like Latino, and they were in an old car." When they were stopped, the "DMV of the vehicle showed that the car was stolen, car jacked." Appellants were then transferred to West Covina, where West Covina officers learned the car was not stolen.

At that point, the prosecutor objected, and at sidebar, questioned how counsel would prove the car was not stolen. Elihu stated she had subpoenaed two officers who interviewed appellants, and the prosecutor argued the testimony would be hearsay and she did not plan to bring up the carjacking. The court allowed Elihu to proceed based on what Elihu expected the evidence to show, and if the evidence was not introduced, Elihu would have to "deal with the consequences." Elihu proceeded to argue the evidence would show the car was not stolen, and as a result, detectives decided there was no probable cause to arrest and hold appellants. Appellants were then transferred to the LAPD, and officers there thought "well, these two gang members with so much tattoos and prior record, they must be up to something." They therefore charged appellants with conspiracy to commit a driveby shooting.

During cross-examination, Elihu asked Officer Wilson at what point did the West Covina Police Department release appellants, and Officer Wilson replied he did not know and he was not there. Elihu then sought to confirm Officer Wilson at some point learned there was no carjacking, and the trial court sustained the prosecutor's hearsay objection. At sidebar, the court noted Officer Wilson could not testify to facts beyond his personal knowledge and the parties would either have to stipulate to the facts of the carjacking charge or the defense would have to call a competent witness to testify.

Later during trial the court requested an offer of proof regarding the West Covina police officers. Elihu stated the two officers would testify to appellants' statements, as well as "other valuable information" in the report. The court permitted Elihu to consider overnight what other information she would elicit from the officers beyond appellants' statements, which the court had already ruled on. The next morning Elihu informed the court she would not be calling the West Covina officers.

40

During Uribe's defense case, retired LAPD Commander Paul Kim testified he was aware Uribe had been transferred to the West Covina Police Department, which transferred appellants back to the LAPD two days later. He testified a police transmission showed the white vehicle appellants were driving was reported as a "West Covina car jacking." LAPD Detective Hector Salas testified he took custody of Uribe after the West Covina Police Department cleared appellants of charges, at which point the LAPD "re-arrested" them on March 8, 2010.

Valadez has not shown his counsel was ineffective during these proceedings. As to the lack of evidence for the carjacking theory, an ineffective assistance claim is only cognizable on direct appeal if reasons for counsel's trial decisions appear in the record or if there is no conceivable reason for the decisions. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) Nothing in the record reflects the reasons for Elihu's strategic decision not to call the West Covina officers and there could have been valid reasons not to. For example, at the start of trial Elihu could have reasonably believed she could prove the car appellants were driving was not stolen and the stolen vehicle charge was fabricated to enable appellants' arrest, only to discover later that theory was unwise. "Making promises about the defense evidence in opening statement and then failing to deliver does not constitute ineffective assistance per se." (*People v. Burnett* (2003) 110 Cal.App.4th 868, 885.) Further, Elihu did not provide ineffective assistance by arguing during opening statements she could rebut the evidence appellants' headlights were off and they were driving slowly, given that there was evidence that officers did not include those important facts in their reports. Valadez's other attorney argued that very point in closing. Thus, we cannot say Elihu's opening statement constituted ineffective assistance of counsel.

*B. Concession During Opening Statements*

Valadez argues Elihu improperly conceded during opening statements the Lowell Street gang was an active gang when she told the jury: "Also, you will hear testimony that Lowell gang is a very small gang. It's so small that it's almost inactive. They have about three members. And there is no injunction. You'll hear testimony there's no

41

injunction against Lowell Street and members to congregate in certain area. [¶] . . . [¶] Also, you will hear testimony regarding -- you'll hear testimony regarding how inactive the Lowell Street gang is and how members interact with each other." However, taken in context, the jury would not have reasonably understood Elihu's comments as conceding Lowell Street was an active gang. Rather, these comments suggested Lowell Street was no longer active, which was consistent with testimony from both appellants' gang expert witnesses. Therefore, Elihu's comment did not amount to ineffective assistance.

*C. Testimony That Valadez Was in Custody*

During recross-examination, Valadez's counsel Fernandez asked Officer Krish if he was aware of any gang activity by Valadez prior to March 6, 2010, and the prosecutor asked to approach the bench. She argued she believed Fernandez's question would open the door to testimony about Valadez's prior robbery conviction because she believed that conviction was indicative of gang activity, even absent a gang allegation, because it was committed with another Lowell Street gang member and they wore bandanas. Fernandez withdrew the question and moved on. Later, Fernandez asked Officer Krish if he was aware of any contacts or activities attributable to Uribe on behalf of a gang in the last three years, to which he responded he had not had contact with him. Fernandez asked the same question about Valadez, to which Officer Krish responded, "There's reasons for that." The court clarified the question was just "have you had any contact with Mr. Valadez," to which Officer Krish responded, "No." Fernandez then asked, "My new question to you is that without any knowledge of what Mr. Valadez has been doing for the last three years, what would be your opinion as to whether he's an active or inactive gang member?"

Before Officer Krish responded, the court held a sidebar, noting Officer Krish said only he had not had any contact with Valadez, not that he was unaware of what Valadez had been doing. The court explained, "There's a big difference between the two. And I'm guessing you could be opening the door to some pretty damaging testimony if you're asking him what he knew about Mr. Valadez, not whether he had any contact with him." The prosecutor argued the question about contacts opened the door to why Officer Krish

would not have had contact with Valadez, namely because he was in state prison until four months before the incident.  The court ruled Fernandez had, in fact, opened the door to this testimony.  Fernandez withdrew the question.

Fernandez stated he had no objection to the prosecutor asking Officer Krish whether, during his time at the Hollenbeck division, he understood Valadez was in custody.  Officer Krish testified his lack of contact with Valadez for the last three years did not affect his opinion that Valadez was a member of the Lowell Street gang.  The prosecutor then asked Officer Krish directly, "To your knowledge, was the defendant in custody during your patrol," to which he replied, "Yes."

Valadez claims Fernandez provided ineffective assistance by opening the door to testimony that Valadez was recently in custody and by failing to object.  Although we cannot identify a sound strategic reason for Fernandez's questioning, Valadez suffered no conceivable prejudice as a result.  The jury knew Valadez had a prior felony and was on parole at the time of his arrest:  Parole Officer Lopez testified to that fact and the court admitted into evidence the "general chrono" related to his parole; and the parties stipulated that appellants each had a prior felony conviction.  Therefore, Officer Krish's additional testimony that he knew Valadez had been in custody was cumulative and Fernandez's opening the door to that testimony and refusing to object to it had no impact on the outcome of the case.

## D. *Failure to Move for Mistrial*

Valadez argues his counsel provided ineffective assistance by failing to move for a mistrial at two points, first when the prosecutor showed Officer Krish Valadez's Mongols gang tattoos, and second when Officer Krish testified the only reason appellants were in the El Sereno area was because they already had or were about to commit a criminal act.  As discussed above, the trial court struck both items of evidence and instructed the jury to disregard them.  A mistrial may only be granted when the defendant's chances of receiving a fair trial have been irreparably damaged (*People v. Clark* (2011) 52 Cal.4th 856, 990; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094) and the "the risk of prejudice must be incurable by admonition or instruction" (*People v. Elliot* (2012) 53

Cal.4th 535, 575). Here, the jury's brief exposure to the limited Mongols gang evidence and Officer Krish's one statement on appellants' intent did not irreparably damage appellants' right to a fair trial and any limited risk of prejudice was cured by the trial court's striking of the evidence and admonishment to the jury to disregard it. (*Id.* at pp. 575-576.) Valadez's attorneys therefore did not provide ineffective assistance by failing to move for a mistrial at either point and, even if they had, Valadez suffered no prejudice as a result.

## 6. Cumulative Error*

We have rejected most of appellants' claims of error, and in those instances in which error occurred, we have found no prejudice. We find no cumulative error warranting reversal. (*People v. Houston* (2012) 54 Cal.4th 1186, 1233.)

## 7. Pitchess *Claim* †

Prior to trial, Valadez moved pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 for discovery of documents relating to complaints against Officers Bueno and Wilson for the fabrication of charges and/or evidence, racial prejudice, dishonesty, false arrest, and illegal search and seizure. (§ 832.7; Evid. Code, §§ 1043, 1045.) The trial court granted the motion "as to veracity and fabrication," based on appellants' denial of using or possessing a handgun at the time of their arrests, and reviewed the officers' personnel records in camera with the custodian of records present. The court found one item discoverable. We have independently reviewed the in camera *Pitchess* proceedings, including the sealed reporter's transcript of the review of the personnel records. We conclude the trial court properly evaluated the materials and appropriately exercised its discretion to order the one item of discovery to be produced. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209; *People v. Mooc* (2001) 26 Cal.4th 1216, 1228.)

---

\*        See footnote, *ante*, page 1.

†        See footnote, *ante*, page 1.

## 8. Presentence Credits[*]

At sentencing, appellants were each awarded 852 days of presentence custody credit, which consisted of 742 actual days and 110 days of conduct credit. In calculating credits, the trial court assumed appellants' offenses constituted violent felonies, which meant they were entitled to good conduct credits of 15 percent of their days in custody. (§ 2933.1, subd. (c).) Appellants claim they are entitled to an additional 261 days, for a total of 1,113 days, because under the version of section 4019 in effect when they committed their offenses, their offenses were not violent felonies and instead were subject to two days of conduct credit for every four days in custody.[19]

The Attorney General agrees appellants are entitled to more presentence credit than awarded by the trial court because the 15 percent formula for violent felonies in section 2933.1, subdivision (c) does not apply. As to Uribe, the Attorney General also agrees he is entitled to two days of conduct credit for every four days in custody and calculates his total as 1,112 days credit (742 actual days and 370 days of conduct credit).[20] As to Valadez, the Attorney General argues he is entitled to good conduct credit of 20 percent of his days in custody under section 667, subdivision (c)(5) because he admitted a prior strike conviction, for a total of 890 days of credit (742 actual days and 148 days of conduct credit).

---

[*]    See footnote, *ante*, page 1.

[19]    Appellants did not raise this contention in the trial court. Section 1237.1 states, "No appeal shall be taken by the defendant from a judgment of conviction on the ground of an error in the calculation of presentence custody credits, unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction of the record in the trial court." However, courts have interpreted this section not to preclude raising a presentence credits issue so long as that is not the only issue raised on appeal. (*People v. Jones* (2000) 82 Cal.App.4th 485, 491; *People v. Duran* (1998) 67 Cal.App.4th 267, 269-270; *People v. Acosta* (1996) 48 Cal.App.4th 411, 420.)

[20]    Uribe claims he is entitled to 371 days of conduct credit, but under the formula in *In re Marquez* (2003) 30 Cal.4th 14, 26, he is actually entitled to 370 days (742 actual custody days ÷ 4 (discarding any remainder) x 2 = 370).

45

We need not recount the recent legislative changes to section 4019 governing the calculation of presentence credits. (See *People v. Brown* (2012) 54 Cal.4th 314, 317-319 (*Brown*); *People v. Garcia* (2012) 209 Cal.App.4th 530, 534-535.) Suffice it to say the parties are correct under any version of section 4019 appellants were not subject to the 15 percent formula in section 2933.1, subdivision (c) because their convictions were not listed as violent felonies in section 667.5, subdivision (c). Instead, the parties are correct that, under all of the versions of section 4019 in effect prior to October 1, 2011, Uribe was eligible for two days of conduct credit for every four days in custody because he was convicted of serious felonies under section 1192.7, subdivision (c)(28), (31), (36), and (42). (*Garcia, supra*, at pp. 540-541.) The Attorney General is also correct Valadez is entitled only to a 20 percent credit of his days in custody under section 667, subdivision (c)(5) because he admitted a prior strike conviction.

Appellants suggest they may be entitled to more credit under the current version of section 4019 as a matter of equal protection, although they recognize the Supreme Court rejected the same argument directed at a prior version of section 4019 in *Brown* and courts have rejected the argument directed at the current version. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 53-56; *People v. Verba* (2012) 210 Cal.App.4th 991, 997; *People v. Kennedy* (2012) 209 Cal.App.4th 385, 396-397; *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1550.) For the reasons stated in those cases, we find appellants' argument foreclosed.

Under the proper formula, Uribe is therefore entitled to 1,112 days of presentence credit (742 actual days and 370 days of conduct credit). Valadez is entitled to 890 days of presentence credit (742 actual days and 148 days of conduct credit).

## DISPOSITION

The judgments are modified to award Uribe 1,112 days of presentence credit (742 actual days and 370 days of conduct credit) and Valadez 890 days of presentence credit (742 actual days and 148 days of conduct credit). In all other respects, the judgments are affirmed. The trial court is directed to amend the abstracts of judgment to reflect the

46

modified presentence custody credits for Uribe and Valadez and forward copies to the Department of Corrections and Rehabilitation.


                                        FLIER, J.

WE CONCUR:


        BIGELOW, P. J.


        RUBIN, J.