Filed 11/5/15  P. v. Morrison CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068067 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FWV1202508) |
| JUAN MORRISON et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Bernardino County, Gregory S. Tavill, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant, Juan Morrison.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant, Carlos Marquez Morrison.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted two brothers, Carlos Marquez Morrison and Juan Morrison,[1] of second degree robbery (Pen. Code, § 211)[2] and found true allegations they committed the robbery for the benefit of, at the direction of, or in association with a criminal street gang (gang benefit enhancement) (§ 186.22, subd. (b)(1)(C)). The court sentenced Carlos to an aggregate term of 13 years in prison based on the middle term of three years for second degree robbery plus 10 years for the gang enhancement. The trial court found true allegations Juan had two prior strike convictions, two prior serious felony convictions and a prison prior.[3] After striking one prior strike conviction and one prior serious felony conviction, the court sentenced Juan to an aggregate term of 20 years in prison based on the mitigated term of two years for second degree robbery doubled to four years as a second strike offender plus 10 years for the gang benefit enhancement, a consecutive term of five years for the prior serious felony conviction, and one year for the prison prior.

---

[1] Because the defendants share a surname, we refer to them by their first names. No disrespect is intended. We refer to them collectively as defendants.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

[3] Although the court did not make an express finding regarding the prison prior on the record, it admitted evidence of Juan's prior prison commitment showing he had not remained free from prison custody for a period of five years after the conclusion of the term before committing the instant offense. The court sentenced Juan based on the prison prior without objection and Juan does not raise this as an issue on appeal.

Carlos contends on appeal: (1) the admission of his statements to a jail officer about his gang affiliation violated his Fifth and Fourteenth Amendment rights; (2) the admission of the gang expert's testimony about field investigation or field identification cards (FI cards) from prior police contacts documenting self-admissions of gang affiliation was improper hearsay and violated his Sixth Amendment confrontation right; (3) the introduction of Juan's admission of gang affiliation to the jail officer violated Carlos's Sixth Amendment confrontation right; (4) the combination of the foregoing errors was prejudicial; and (5) there was no substantial evidence to support the gang benefit enhancement finding. Juan joins Carlos's first, second and fourth arguments.

Juan contends: (1) there was no substantial evidence to support his robbery conviction; (2) the prosecutor committed prejudicial misconduct during supplemental closing arguments about aiding and abetting second degree robbery; and (3) his defense counsel rendered ineffective assistance by failing to object to the prosecutor's statements. Carlos joins any of Juan's arguments that are beneficial to him. Finding no prejudicial error, we affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

On the morning of October 3, 2012, Shane Mack rode his Italian fold-up bicycle to a liquor store in Rancho Cucamonga. Mack purchased the bicycle two days before as a gift from his father.[4]

As he approached the store, Mack got off his bicycle and walked it across the street. Before he got to the liquor store, Carlos approached him and said, "This is Compton, cuz'." Juan then approached and said, "This is Nutty Block."

Mack responded by saying, "I'm a college student" and "[w]hat's the problem?" Carlos punched Mack's jaw and they started fighting. Juan jumped in and started hitting Mack. During the fight, Mack felt the lanyard being removed from around his neck and someone going through his pocket. His garage door opener and wallet were taken out of his pocket. While Mack was being hit, he heard someone say, "Grab that."

Mack ran across the street with Carlos following him until Mack reached and entered a grocery store. Mack looked back during the pursuit and saw Juan with his bicycle.[5]

---

[4] Mack testified he purchased the bicycle for $3,000. On the day of the incident, he told the investigating officer he estimated its value at $700.

[5] The liquor store clerk testified he saw Carlos with the bicycle after Carlos returned from chasing Mack across the street. When the clerk asked Carlos if it was his bicycle, Carlos said it was his. The clerk did not see Carlos walk away with the bicycle.

Mack called a friend from the store and then went home. He returned to the liquor store with his girlfriend and another friend. Mack asked the store clerk if he had seen anything or if there was video footage. The clerk said he did not want to get involved. Mack found most of his items in the grass except for his lanyard and bicycle.

Mack went to the gas station near the liquor store and went to apartments across the street to see if anyone had seen anything or his bicycle. Mack had seen Carlos around the apartments before and recognized the letters "CR" tattooed on his neck, but denied knowing him personally.

When Mack returned to the liquor store, he met the defendants who were also walking toward the store. Mack approached them and asked for his bicycle. Carlos said Mack was not getting it back and they started fighting again. At least one of the defendants took his shirt off. Mack saw a "Raymond" tattoo and a "Nutty Block" tattoo. Juan said, this is "Nutty Block" and Carlos said this is "Raymond Crip." Mack assumed they meant it was a Crip hood. Mack started fighting with Carlos and Juan jumped in again.

The fight stopped when a police officer arrived. The officer observed four males facing off in the parking lot, with two closing in on each other. When the officer detained Mack's friend, Mack said he had the wrong person. Mack pointed to the defendants and said they had robbed him. Both defendants took off running.

The officer pursued the defendants across the street. The officer was able to stop and handcuff both defendants. When another officer searched the defendants, he found Mack's lanyard in Carlos's pocket.

B

A deputy with the San Bernardino County Sheriff's department conducted classification interviews with Carlos and Mack after they were arrested and booked into jail. These classification interviews help determine where inmates are housed for the security of the correctional facility.

Carlos stated he was a member of the Raymond Street Crips gang (Raymond), which he joined when he was in the fifth grade. He denied being a dropout. Carlos had "Raymond" tattooed across his chest and "R$H," which the deputy understood to stand for Raymond Street Hustler. Carlos also had the letters "CR" tattooed on his neck.

Although Juan initially denied being active in a gang, he later admitted being a member of the Nutty Block Crips (Nutty Block). Juan was "jumped" into the Nutty Block gang at age 16. He also denied being a gang dropout. Juan has visible tattoos identifying him as a gang member including "Nutty by Choice," the letters "NY" for young and nutty, and the letters "NBCC" for Nutty Block Compton Crip.

The court admitted the deputy's testimony regarding his classification observations and the statements of the defendants. However, the court instructed the jury not to consider Carlos's classification statements for the case against Juan and not to consider Juan's classification statements for the case against Carlos.

C

A gang investigator for the Los Angeles County Sheriff's department served as the People's gang expert. He testified regarding his familiarity with the Nutty Block gang, which is a West Side Crips gang within the city of Compton. The primary activities of

6

Nutty Block include narcotic sales, firearm sales, firearm possession, robberies, home invasions, burglaries, and murder. Members advance in the gang by committing crimes, increasing status, and putting time in with the gang. There are approximately 225 to 250 members of Nutty Block. A common symbol for Nutty Block are the letters "NY" using the New York Yankees logo. Other symbols include "NBCC" or "Young Nutty."

Raymond is also a Crip gang from Compton. Raymond Street is within the Nutty Block turf. Raymond members use the symbol "R$H." The letters "CR," using the Colorado Rockies' logo, are used as an abbreviation for Crip. The gang expert opined Nutty Block and Raymond are essentially one gang. "A lot of people will cross claim."

In the gang expert's opinion, Raymond is a clique of older members within Nutty Block. The expert stated, "You really don't see younger generation of the [Raymond] anymore. Nobody's been getting jumped in. Nobody's been, you know, arrested claiming Raymond." Some claim it, but not as often. There are 10 to 15 active members of Raymond who would also claim and be accepted by Nutty Block members. In his opinion, not as many people claim Raymond because the Raymond identity is becoming Nutty Block. It is common for an individual to say they are from Raymond, but are really a member of Nutty Block.

Nutty Block and Raymond share a "hood day," which marks the formation of the gang. They gather at a park, usually in Compton, and conduct business such as firearms or narcotics trafficking. Nutty Block has a pecking order and a leader. The gang expert is not aware of a separate command structure for Raymond. Blue and gray are the colors used for Nutty Block and Raymond members.

7

The gang expert reviewed FI cards regarding Juan from two police contacts in 2011. On each occasion, Juan admitted being a member of Nutty Block, bore Nutty Block tattoos, and was found with other gang members including Carlos. The gang expert also reviewed photographs of Juan's tattoos, which included: "NY"; "Nutty by Choice"; "NBCC"; "Young" and "Nutty" on his forearms, which together would read "Young Nutty"; the numbers "165" and "166" for streets within the area controlled by Nutty Block; and the number "2" on each tricep. The number "2" corresponds to the letter C on a telephone keypad, so "22" would mean "CC" or Compton Crip. The gang expert opined Juan was a member of the Nutty Block criminal street gang based on the FI cards, tattoos, self-admissions, and associates.

The gang expert also reviewed the FI cards for Carlos regarding two contacts in the Nutty Block area of Compton in 2008. Carlos claimed he was a member of Raymond in January 2008, but claimed Nutty Block in September 2008. The expert testified it is common for someone to claim both Nutty Block and Raymond, and to interchange them. The expert opined Carlos was a member of the "Nutty Block, Raymond Crips." He based this opinion on Carlos's tattoos, among other things, which included "Raymond" and "R$H." He also had the number "2" tattooed on each of his triceps and the letters "CC" tattooed on his abdomen. Carlos had a dollar sign tattooed on his neck, representing the importance of making money. He also had the letters "CR" tattooed on his neck.

The gang expert testified regarding separate criminal offenses committed by other members of the Nutty Block criminal street gang. These included assault with a deadly weapon, dissuading a witness from reporting a crime, and being a felon in possession of a

8

firearm, all of which are crimes or activities associated with the Nutty Block criminal street gang, which would include Raymond.

The gang expert opined the robbery in this case was committed for the benefit of, at the direction of, or in association with the Nutty Block criminal street gang. This crime, committed in broad daylight at a busy location in front of witnesses, would benefit the criminal street gang because it was a brazen act committed to instill fear in the general community and showed dominance. The defendants also benefitted because the crime would enhance their reputation in the gang based on stories that would be told about the incident and could entice younger potential gang members.

It is not uncommon for a Compton gang to commit a crime in another county, such as San Bernardino. A crime committed outside of the gang territory would indicate the gang is claiming the area or trying to move in on an existing gang claiming the territory.

The expert opined Carlos and Juan acted in association to benefit the gang based on the fact they committed the crime together as gang members and threw out gang names during the commission of the crime. It is common for gang members to commit crimes together or with members of other gangs. This helps the gang because it increases the likelihood of success and increases the status of the individual within the gang.

D

Carlos testified in his own defense. Carlos grew up in Compton, but visited Rancho Cucamonga frequently because his girlfriend lived across the street from the liquor store. He testified he was at the liquor store on the morning of the incident waiting

9

for a friend to arrive on a bus. He went into the store to purchase something. When he came out, he saw Mack and they locked eyes.

Carlos testified he had previously met Mack in the apartment complex and bought marijuana from him. They communicated by cell phone and text messages and saw each other around the apartment complex and at the liquor store. Carlos stated they "fell off through the texting" and established they were going to fight when they saw each other. On the day of the incident, they exchanged words. Carlos dropped his bag and Mack dropped his bike before Carlos hit Mack. Carlos testified Juan became involved in the fight when Juan pushed Mack away from hitting Carlos again. When Mack ran across the street, Carlos pursued him. Carlos testified he and Juan ran across the street and down the steps, but, since they did not know where Mack went, they returned to the liquor store. Carlos denied either he or Juan took Mack's bicycle.

Carlos testified he picked up his bag from outside the store and spoke to the store clerk briefly about a cell phone. Carlos testified Juan lost his cell phone and they went to look for it. When they could not find it, they returned to the store to see if there was a video showing four individuals who were in front of the liquor store.

Upon their return, they met Mack in the parking lot with Mack's girlfriend and another individual. Carlos and Juan took their shirts off and Carlos began fighting with Mack while Juan and the other individual refereed. Carlos denied mentioning Raymond or Nutty Block.

Carlos stated the Raymond tattoo on his chest is a street in Compton where his family members live. The "R$H" tattoo on his left hand is for Raymond Street Hustler.

10

Carlos testified he has the number "2" tattooed on each of his arms because 22 is his favorite number, having adopted it from his older brother. He stated the "CR" tattoo stands for Central and Reeves, which is a cross street near his mother's house in Compton. He denied he told a detective it stood for Raymond Crip. He stated he has a dollar sign tattooed on his neck because he likes money. He said the "CC" tattoo on his stomach stands for Compton, California, but conceded it can stand for Compton Crip. He considers himself part of Raymond, but denied it is a gang. He also denied being part of Nutty Block. He denied telling a detective he was born and raised a Crip and will always be a Crip.

Carlos said Juan's "NBC" tattoo stands for Nutty Block Crip because Juan used to be part of the Nutty Block Crips. Juan has the number "2" tattooed on each arm, as does Carlos. Both Juan and Carlos have a dollar sign tattooed on one side of their necks. Juan has "NY" tattooed on the other side of his neck while Carlos has "CR" tattooed on his neck.

E

On rebuttal, a detective with the San Bernardino County Sheriff's Department testified Carlos initially told him Raymond stood for the street he lived on, but he later admitted it stood for Raymond Crip. When asked if he was a Crip, Carlos stated, "I was born and raised a Crip. I'll always be a Crip."

11

DISCUSSION

I

*Classification Statements*

Carlos and Juan contend their admissions of gang affiliation during the jail classification interviews were inadmissible because they were given without the prophylactic admonitions required to protect their rights under the Fifth and Fourteenth Amendments (*Miranda v. Arizona* (1966) 384 U.S. 436, 478-479 (*Miranda*)) and because the admissions were allegedly coerced based on promises they would be housed together if they told the truth about their gang affiliations. The People contend the admissions were admissible because questions about gang affiliation made for legitimate administrative purposes fall within the booking exception to *Miranda* and the statements were not coerced.

The Supreme Court recently clarified correctional officers are permitted to ask routine questions regarding gang affiliation for institutional security purposes, but un-*Mirandized* responses or admissions to such questions are not admissible against the defendant in the criminal trial. (*People v. Elizalde* (2015) 61 Cal.4th 523, 527, 540-541 (*Elizalde*).) "Gang affiliation questions do not conform to the narrow exception contemplated in [*Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*)] and [*Pennsylvania v. Muniz* (1990) 496 U.S. 582] for basic identifying biographical data necessary for booking or pretrial services. Instead, they must be measured under the general *Innis* test, which defines as 'interrogation' questions the police should know are 'reasonably likely to elicit an incriminating response.' " (*Elizalde*, *supra*, 61 Cal.4th at p. 538.) Applying *Innis*, the

12

court concluded the gang affiliation questions posed during booking without *Miranda* warnings were reasonably likely to elicit an incriminating response. (*Ibid*.) Since the *Elizalde* defendant was charged with murder "a crime frequently committed for the benefit of criminal street gangs, and a qualifying offense establishing a ' "pattern of criminal gang activity" ' " the Supreme Court determined questions about gang affiliation were reasonably likely to elicit an incriminating response because the defendant was subject to enhanced punishment under California's scheme of penal statutes directed to eradicating criminal activity by street gangs. (*Id*. at pp. 539-540.)

Similarly here, Carlos and Juan were questioned about their gang affiliations during the classification process without receiving *Miranda* warnings. The interviewing officer did not know the facts of the case leading to the arrest, but he knew the charges. Carlos and Juan were charged with robbery in violation of section 211, which, as in *Elizalde*, is a qualifying offense establishing a pattern of criminal gang activity. (§ 186.22, subd. (e)(2).) Therefore, the officer should have known the gang affiliation questions posed in this case were reasonably likely to elicit incriminating responses. The unadmonished statements made during the classification interviews were inadmissible at trial. (*Elizalde*, *supra*, 61 Cal.4th at p. 540.)

Nevertheless, as in *Elizalde*, the error was harmless. The Supreme Court applied the standard of prejudice as established by *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct.824, 17 L.Ed.2d 705], which requires proof " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Elizalde*, *supra*, 61 Cal.4th at p. 542.)

13

In this case, gang affiliation was convincingly established based on evidence other than the jail classification admissions. Both Carlos and Juan had conspicuous gang tattoos on their bodies and they made statements about gang affiliation during the crime. The expert opined they were gang members based on his knowledge of Nutty Block and Raymond, his observations of the defendants' tattoos, the facts of the case, and facts documented from field interviews such as where Carlos and Juan were contacted within Nutty Block territory, the presence of other gang members, and self-admissions during those field interviews. In addition, Carlos admitted to an investigating detective his "CR" tattoo represented Raymond Crip and he said, "I was born and raised a Crip. I will always be a Crip." He admitted he considers himself to be part of Raymond, which the expert testified is part of Nutty Block. Given this evidence, we conclude the admission of the classification statements was harmless beyond a reasonable doubt. (*Elizalde*, *supra*, 61 Cal.4th at p. 542.)

For the same reason, we reject Carlos's contention the admission of Juan's admission of gang membership in the classification interview violated Carlos's confrontation right pursuant to *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123. The court instructed the jury not to consider Juan's admission in connection with the case against Carlos and there was clear evidence of Carlos's gang membership even without the classification statements. Therefore, even if there was error, it was harmless. It is not reasonably probable Carlos would have obtained a more favorable verdict in a separate trial. (*People v. Ortiz* (1978) 22 Cal.3d 38, 46.)

14

## II

### *Gang Expert Testimony Based on FI Cards*

Carlos and Juan contend the court erred in allowing the gang expert to testify about their admissions of gang affiliation made during prior encounters with law enforcement as documented on FI cards. They contend these self-admissions were testimonial hearsay and the admission of these statements violated their rights under the confrontation clause of the Sixth Amendment to the United States Constitution. Assuming, without deciding, the notations on the FI cards of gang self-admissions were hearsay, i.e. offered for the truth of the matter stated (Evid. Code, § 1200), we conclude they are not testimonial and the gang expert's testimony about them did not violate the confrontation clause.[6]

We apply the abuse of discretion standard when reviewing the trial court's admission of expert testimony. (*People v. Valadez* (2013) 220 Cal.App.4th 16, 29 (*Valadez*).) We apply the de novo standard of review for claims implicating federal constitutional rights such as the confrontation clause. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.)

---

[6] The court did not admit the FI cards into evidence, but allowed the gang expert to discuss them as one basis, among others, for his opinions that Juan and Carlos were active gang members. The court noted the expert could be cross-examined regarding his knowledge, or lack thereof, of the encounters documented on the FI cards. The defendants only challenge the expert's testimony about the self-admission notations on the FI cards, not other observations noted on the cards.

15

California law generally permits an expert to testify regarding his or her opinions based on "matter (including his [or her] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him [or her] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates."  (Evid. Code, § 801, subd. (b).)

Under current law, gang experts are allowed to describe reliable hearsay evidence, including written material and information drawn from many sources, used to form their opinions even if the evidence is otherwise inadmissible.  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 949; *People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*).)  However, "a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact."  (*Gardeley*, *supra*, 14 Cal.4th at p. 619.)

Although *Gardeley*, *supra*, 14 Cal.4th 605 did not involve the Sixth Amendment's confrontation clause, courts have interpreted *Gardeley* to suggest there can be no violation of the confrontation clause for basis evidence used by a gang expert because it is not offered for the truth, but rather to assist the jury in evaluating the expert's opinion. (*Valadez*, *supra*, 220 Cal.App.4th at p. 30; *People v. Thomas* (2005) 130 Cal.App.4th 1202, 1210.)  This analysis has been criticized by cases noting "the jury will often be required to determine or assume the truth of the [out-of-court] statement in order to utilize it to evaluate the expert's opinion."  (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1131.)  Nevertheless, *Hill* and other courts have concluded they are bound by *Gardeley*

16

and its progeny to hold the admission of out-of-court statements, as expert opinion basis evidence does not violate the confrontation clause. (*Hill*, *supra*, at p. 1131, citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455; *Valadez*, *supra*, 220 Cal.App.4th at pp. 30-31.) The question of whether an expert's reliance on testimonial hearsay to form his or her opinion violates a defendant's Sixth Amendment right to confrontation is now pending before the California Supreme Court. (See *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681 and *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640.)

We conclude the self-admissions documented on the FI cards were not testimonial hearsay and do not violate the confrontation clause. The confrontation clause of the Sixth Amendment guarantees a defendant in a criminal prosecution " 'the right … to be confronted with the witnesses against him.' " (*Crawford v. Washington* (2004) 541 U.S. 36, 42 (*Crawford*).) The United States Supreme Court held it is a violation of the confrontation clause to admit a testimonial hearsay statement from a declarant who is unavailable to testify unless the defendant had a prior opportunity for cross-examination. (*Id*. at pp. 59, 68.) The Supreme Court did not provide a comprehensive definition of "testimonial" noting only, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id*. at p. 68.)

The California Supreme Court, however, has identified two critical components for a testimonial statement. "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its

17

primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619 (*Dungo*); see *People v. Lopez* (2012) 55 Cal.4th 569, 581-582 (*Lopez*).)

In *Dungo*, the court held the facts related by an expert from an autopsy report "were not so formal and solemn as to be considered testimonial for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question." (*Dungo*, *supra*, 55 Cal.4th at p. 621.) In *Lopez,* the court held a laboratory report, which included computer generated results and a laboratory technician's notation linking the blood sample with a statement it contained 0.09 percent alcohol, lacked the formality necessary to be testimonial. (*Lopez*, *supra*, 55 Cal.4th at pp. 584-585.)[7]

We conclude the self-admission statements documented on the FI cards in this case do not bear the formality or solemnity necessary for testimonial statements. (*People v. Cage* (2007) 40 Cal.4th 965, 987.) The gang expert explained FI cards are small cards used by the Los Angeles County Sheriff's Department to document contact with an individual. Officers use the FI cards to record the individual's name, date of birth, height and weight, time and location of the contact, other gang members with whom the

---

[7] The *Lopez* court distinguished the laboratory report before it from those cases in which the United States Supreme Court found a signed laboratory report and a report referencing rules of court sufficiently formal to be testimonial. (*Lopez*, *supra*, 55 Cal.4th at p. 584 distinguishing *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310 [129 S.Ct. 2527, 174 L.Ed.2d 314] and *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705, 2717, 180 L.Ed.2d 610].)

18

individual is associated, what the individual is wearing, and the individual's tattoos. Officers use these cards as tools to track individuals and information about the gang, such as the number of members. The cards are also useful for future investigations. There is no training for preparation of the FI cards, but officers use them regularly and other departments use similar cards.

The FI cards are used for consensual contacts, investigational contacts where there are no arrests, or arrests. The expert testified it is not uncommon for individuals to admit gang membership in the course of consensual contacts and for these to be documented on FI cards.

Carlos and Juan were not arrested in connection with any of the contacts documented in the FI cards. This suggests the cards were prepared in connection with a consensual contact or where they were free to leave even if the contact was related in some way to an investigation.

Additionally, the fact the gang expert used these FI cards as a basis for his opinion does not mean the *primary purpose* in documenting the information was to use it against the defendants in a later criminal prosecution. (*Valadez*, *supra*, 220 Cal.App.4th at p. 36.) The gang expert testified he had conducted hundreds of interviews of gang members in the Compton area, including monthly contacts with some individuals. Gathering information through such routine contacts and disseminating the information by the use of FI cards serves purposes other than to establish past events for criminal prosecution. "Day in and day out such information would be useful to the police as part of their general community policing responsibilities quite separate from any use in some

19

unspecified criminal prosecution." (*People v. Valadez*, *supra*, 220 Cal.App.4th at p. 36.) Therefore, the self-admissions the expert relied upon from the FI cards to support his opinion were not testimonial hearsay and did not violate the confrontation clause.

Even if it could be deemed error to admit testimony about the self-admissions documented on the FI cards, it was harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.) The gang expert testified to his years of personal experience and knowledge regarding criminal street gangs in Compton, including Nutty Block and the Raymond clique within Nutty Block. He opined the defendants were gang members based on the numerous gang tattoos on their bodies, the statements they made during the robbery, the facts of the robbery itself, and information he gathered from talking to other detectives. This is in addition to unchallenged observations recorded on the FI cards regarding the locations within gang territory where Juan and Carlos were contacted and their association with gang members known to the expert. In light of this overwhelming evidence, it is beyond reasonable doubt the exclusion of information regarding self-admissions from the FI cards would not have affected the outcome of the trial.

III

*Cumulative Error*

We also reject Carlos's claim of cumulative error. In the context of the entire trial, there is no reasonable possibility any of the foregoing claims of error, considered singly or cumulatively, affected the outcome. (*People v. Dykes* (2009) 46 Cal.4th 731, 820.)

20

IV

*Substantial Evidence*

Carlos contends insufficient evidence was presented to support his gang benefit enhancement finding. Juan contends insufficient evidence was presented to support his robbery conviction. We reject both of these contentions.

A

*Standard of Review*

In evaluating a sufficiency of the evidence claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever

21

is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

B

*Evidence Supporting Carlos's Gang Benefit Enhancement Finding*

Carlos contends there was insufficient evidence for the gang benefit enhancement finding against him because there was no substantial evidence Raymond was a criminal street gang or that he committed the crime for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote criminal conduct by gang members.  We disagree.

In an effort to combat gang-related crimes and violence, section 186.22, subdivision (b), imposes sentencing enhancement if the prosecution establishes a defendant committed a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1); *People v. Prunty* (2015) 62 Cal.4th 59, 67 (*Prunty*).)  To establish the truth of a gang benefit enhancement allegation under section 186.22, subdivision (b)(1), the prosecutor must prove: "first, that the defendant committed a felony (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang; and second, that in connection with the felony, the defendant harbored the *specific intent* to (a) promote, (b) further, or (c) assist in any criminal conduct by gang members."  (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1358; accord, *Gardeley*, *supra*, 14 Cal.4th at pp. 616-617; *People v. Williams* (2009) 170 Cal.App.4th 587, 625.)  In other words, the prosecution must prove a criminal street gang

22

exists, as defined by the statute, and the defendant "sought to benefit that particular gang when committing the underlying felony." (*Prunty, supra,* at p. 67.)

Section 186.22, subdivision (f), "defines a 'criminal street gang' as an 'ongoing organization, association or group.' [Citation.] That 'group' must have 'three or more persons,' and its 'primary activities' must consist of certain crimes. [Citation.] The same 'group' must also have a common name or common identifying sign or symbol,' and its members must be proven to have engaged in a 'pattern of criminal gang activity' by committing predicate offenses." (*Prunty*, *supra*, 62 Cal.4th at p. 71.)

The Supreme Court recently held, "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22[, subdivision] (f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 71.) "Evidence—even indirect evidence—showing collaboration among subset members, long-term relationships among members of different subsets, use of the same 'turf,' behavior demonstrating a shared identity with one another or with a larger organization, and similar proof will show that individual subsets are part of a larger group." (*Id.* at pp. 73-74.)[8] The prosecution may meet its burden of proving a gang benefit enhancement allegation by presenting testimony from a gang expert. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 820; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048; *Gardeley*, *supra*, 14 Cal. 4th at pp. 617-620.)

----

[8] At our request, the parties provided supplemental briefing regarding this case.

23

Carlos acknowledges the gang expert in this case testified Nutty Block and Raymond were the same gang, but contends the expert's opinion lacked foundation. We cannot agree. The gang expert provided un-refuted testimony regarding his knowledge of the Nutty Block gang and its subset, Raymond, based on his years of experience with Compton gangs and hundreds of interviews with gang members. He testified Nutty Block and Raymond are the same gang and Raymond is a small clique of older members from a street within Nutty Block territory. The members who would claim Raymond would also claim and be accepted by the Nutty Block members. This included Carlos, who claimed both Nutty Block and Raymond in the FI cards.

It is common for members of Nutty Block and Raymond to commit crimes together. Nutty Block and Raymond share a common "hood day" when they meet at a park to "conduct business" such as firearms and narcotics trafficking. Organizationally, Nutty Block has a command structure run by a single individual, whereas Raymond does not have a separate command structure.

Carlos was previously contacted in Nutty Block territory with other gang members, including his brother. Carlos and Juan committed the robbery at issue together, declaring an area in Rancho Cucamonga as Nutty Block and Raymond territory. All of this evidence of communication between members and joint work was sufficient to allow the jury to infer Nutty Block and Raymond should be treated as a single street gang.

Additionally, the statute does not require the defendant to be an active or current member of the gang benefiting from the crime. (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402; see *People v. Albillar* (2010) 51 Cal.4th 47, 67-68 [applicability of gang

24

enhancement "does not depend on membership in a gang at all"].) There was substantial evidence Carlos committed the crime for the benefit of Nutty Block even if he was not a member of Nutty Block or if Raymond did not qualify as a criminal street gang. Nutty Block qualifies as a criminal street gang. Carlos committed the robbery with Juan, a Nutty Block member, while they both claimed territory in San Bernardino County for Nutty Block and Compton Crips. There is more than ample evidence to support the jury's true finding of the gang benefit enhancement for Carlos.

C

*Evidence Supporting Juan's Robbery Convictions*

Juan contends there is insufficient evidence he intended to steal Mack's property or to aid and abet the taking of his property to support his conviction for robbery. Again, we cannot agree.

1

*Background*

During deliberations, the jury sent out a note asking, "If we believe that [Juan] participated willfully in the fight in which a theft occurred by someone in his party, in which he is [aligned], but Juan did not take the items in question, is he also guilty of the theft even though he did not personally take any items. By association with the crime/event." The court responded by giving standard jury instructions regarding aiding and abetting and allowed supplemental closing arguments on this issue.

2

*Analysis*

" 'Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' (§ 211.) To be convicted of robbery, the perpetrator must intend to deprive the victim of the property permanently. [Citations.] Robbery requires the 'intent to steal … either before or during the commission of the act of force' [citation], because '[i]f [the] intent to steal arose after the victim was assaulted, the robbery element of stealing by force or fear is absent.' " (*People v. Huggins* (2006) 38 Cal.4th 175, 214.) A defendant may be guilty as an aider and abettor if he "act[s] with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560; see *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118.)

Viewing the evidence in the light most favorable to the prosecution and presuming in support of the judgment the existence of every fact the jury could reasonably have inferred from the evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357), substantial evidence supports Juan's second degree robbery conviction. Juan did not just join in the first fight. When Carlos approached Mack with his bicycle and challenged him by saying "This is Compton, cuz'," Juan also made a gang claim saying, "This is Nutty Block." During the first fight, in which both Carlos and Juan participated, Mack felt someone going through his pockets, taking his lanyard from around his head and he heard someone say "grab that." The jury reasonably could have inferred Juan was working in concert

26

with Carlos to commit the robbery whether or not he took the items himself. While Carlos pursued Mack across the street and through a parking lot, Mack turned back and saw Juan with his bicycle. When Mack returned the bicycle was gone. From this evidence, the jury reasonably could have inferred either Juan committed the robbery himself by taking the bicycle and other items, or he was guilty under an aiding and abetting theory.[9]

Later in the day, Mack approached both Carlos and Juan to ask for his bicycle. Mack initially testified "they told me I'm not getting it and we just started fighting." Mack then said Carlos actually made the statement. However, Juan did more than stand idly by. He took off his shirt to fight and again claimed the area for Nutty Block. The jury reasonably could have inferred Juan communicated, verbally or nonverbally, an intention to permanently deprive Mack of the bicycle through force or fear. Therefore, even if Juan did not actually take the bicycle himself, there was substantial evidence to support the second degree robbery conviction.

V

*Prosecutor Remarks During Closing Argument*

Finally, Juan contends the prosecutor committed misconduct in violation of his due process rights by misstating the facts and the law in supplemental closing arguments regarding the aiding and abetting theory and his counsel rendered ineffective assistance

---

[9]     The testimony of a single witness is sufficient to support a verdict. (*People v. Zavala* (2005) 130 Cal.App.4th 758, 766.) We do not reassess the credibility of the witnesses. (*People v. Friend* (2009) 47 Cal.4th 1, 41.)

by failing to object. Specifically, Juan contends the prosecutor misstated the facts when she argued both defendants said Mack could not have his bicycle whereas he later said Carlos made the statement. Juan also contends the prosecutor misstated the law by saying Juan was liable for "any crime" because Juan participated in the fight and referred to Nutty Block. We find no merit in these contentions.

"Because defendant did not object to, or request that the jury be admonished in light of, any of the foregoing remarks, the claim has been forfeited." (*People v. Huggins*, *supra*, 38 Cal.4th at p. 205.) Nevertheless, even exercising our discretion to consider the issue, we conclude there was no prejudicial misconduct. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679.)[10]

Although counsel may not mischaracterize evidence or state facts not in evidence, counsel is allowed " 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence' " and " ' "[w]hether the inferences the prosecutor draws are reasonable is for the jury to decide." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 133-134.) As discussed in section IV.C.2, *infra*, the jury could have drawn a

---

10    Because we exercise our discretion to consider the merits of the prosecutorial misconduct argument, we need not reach the issue of ineffective assistance of counsel. We note, however, " '[f]ailure to object rarely constitutes constitutionally ineffective legal representation . . . .' [Citation.] Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citation.] These were not situations in which there could be no satisfactory explanation for counsel's failing to object to the remarks of which defendant now complains. For example, counsel could have preferred not to draw the jurors' attention to particular comments by the prosecutor by objecting to them." (*People v. Huggins*, *supra*, 38 Cal.4th at p. 206.)

reasonable inference both defendants conveyed Mack was not getting back his bicycle, even if Juan did not say so in so many words.

In the context of discussing the first and second aiding and abetting elements, the prosecutor made the comment Juan was liable for "any crime that happened to the victim that day" because he referred to Nutty Block and joined the fight. The prosecutor then argued Juan intended to aid Carlos because Juan saw Carlos approach Mack with the bicycle and claim Compton. Juan claimed Nutty Block and participated in the fight in which items were taken, whether he took them or not. Before the second fight, both defendants conveyed they were not going to return Mack's bicycle. Both defendants fled the scene when Mack told police the defendants robbed him.

The trial court correctly instructed the jury regarding the aiding and abetting theory and further instructed the jury the arguments of counsel were not evidence and "[o]nly the witness' answers are evidence." We presume the jury followed the instructions of the court absent any contrary indication. (*People v. Gray* (2005) 37 Cal.4th 168, 217.)

Considering the record as a whole, we cannot conclude there is a reasonable likelihood the jury construed or applied the prosecutor's statements in an objectionable fashion. (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1269.)

29

DISPOSITION

The judgments are affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

NARES, J.